Edwin, Kassoff, J.
This is an action by the Mobil Oil Corporation (petitioner) to recover possession of a gasoline station *393 located at 75-02 260th Street, Glen Oaks, New York, from Paul Rubenfeld (respondent). Petitioner, the prime lessee, sublet the premises to the respondent for a period of three years. The sublease expired on September 30, 1972. Rubenfeld refused to vacate the. premises and Mobil commenced this action to recover possession of the property. Respondent’s answer contained six affirmative defenses. The fifth affirmative defense claims the petitioner may not terminate the retail dealer agreement and lease without proof of good cause. The sixth affirmative defense asserts that the petitioner seeks to control and fix the retail sales price of gasoline through means of coercion and cancels or threatens to cancel leases of those Mobil dealers, including the respondent, who refuse to co-operate.
Prior to 1955, the respondent was an employee of a Mobil gasoline station in Brooklyn. Sometime in 1955 the respondent discussed obtaining a Mobil dealership with the district and assistant managers of the Mobil Oil Corporation. As a result of these conversations, and upon completion of a training program, the respondent was given a Mobil gasoline station located at 254-02 Hillside Avenue, Queens, New York. At the inception of his relationship with Mobil, it was represented to him, by petitioner, that he would be building a good future for himself and his family and that he would be an independent businessman. Respondent was presented with a printed form Retail Dealers Contract ” and a printed form lease. Respondent testified that he was told by the petitioner that he could not have an attorney A present when he executed these agreements. The reason given by Mobil was that they would-not tolerate changes in any of the provisions of the printed agreements.
Rubenfeld testified that he made an initial investment of $4,000 and that during the next 10 years he invested about $50,000 in the dealership for machinery and trucks. During this period the station was open from 6 a.m. to 2 a.m. The original dealer agreement and lease were for a one-year period. Mobil told Rubenfeld that if he proved to be a good dealer during the first year, future dealer agreements and leases would be for three-year terms. Thereafter, there were three renewals of the agreements, each for a period of three years. Rubenfeld was not represented by legal counsel when any of these renewal agreements were executed.
In 1965, the respondent opened a second Mobil station which is the subject of this action. The initial dealer’s contract and lease were for a one-year period. A representative of Mobil told Rubenfeld that it was company policy to issue one-year *394 contracts and leases for new stations. This applied to Rubenfeld even though he had been a Mobil dealer for 10 years. He was told that he would get three-year renewals if he proved to . be a good dealer. Rubenfeld was not represented by legal coun'sel when he executed the contract and lease for the second station. The same reasons were given by Mobil for not permitting respondent to be represented by legal counsel. Rubenfeld executed a printed form dealer agreement, and an 11-page printed form lease containing numerous riders, both of which were drafted and prepared by Mobil and presented to the respondent on a take it or leave it basis.
Respondent operated both stations for six months and then discontinued operation of the first station. It appears that this was done by mutual agreement. Upon the expiration of the' one-year dealer contract and lease, the parties entered into a three-year agreement. This agreement was renewed on October 23,1969 for another three-year period. Rubenfeld was not represented by legal counsel when any of these renewal agreements were executed.
Respondent testified that during the seven years that he operated this second station, he invested about $25,000 for machinery, furniture, trucks, and two-way radios. This second station is open seven days a week from 7 a.m. to midnight. Both stations were always operated at a profit. Rubenfeld testified that he spends between 70 and 80 hours each week at the station.
Rubenfeld testified that on various occasions in 1971 .and 1972, | he was warned by Mobil representatives that his dealer contract > and lease would not be renewed, unless he agreed to sell his gasoline at prices fixed by Mobil, and to resume purchasing his tires, batteries, and accessories (TBA) from Mobil.
In 1972, respondent filed a complaint with the Attorney-G-eneral of the State of New York regarding Mobil’s coercive attempts to force him to enter into a price fixing scheme for the sale of his gasoline and Mobil’s insistence upon his purchasing petitioner’s TBA.
John Leone, a Mobil dealer for 21 years, and another dealer named Allan Madnich, were called as witnesses for respondent. The attorneys for the respective parties stipulated on the record that both witnesses would testify that they were Mobil dealers and that their leases were not renewed because of their refusal to agree to fix the retail sales price of their gasoline, and to purchase TBA from Mobil, without admitting the truth of their statements.
*395 Petitioner’s witnesses testified that they sent a notice of non-renewal to respondent and that respondent refused to vacate the premises.
Mohil’s district sales manager, Mr. Candeloro, testified that the dealer agreement and lease are executed together, and that Mobil would not issue a lease unless the retail dealer contract was executed at the same time.
Petitioner’s witnesses also testified that there are over 200 Mobil stations in the Queens-Long Island area that sell 100 million gallons of gasoline each year, and that there are over 24,000 Mobil service stations in the United States.
Mobil set forth in its petition to recover possession of real property that it is a corporation, organized and existing under and by virtue of the laws of the State of New York. Respondent in his answer denied knowledge or information sufficient to form a belief as to this allegation, and as an affirmative defense alleged that the petitioner did not offer proof that the petitioner was either a domestic corporation or a foreign corporation duly licensed under the laws of New York State. As the court wanted to decide the case on its merits, it ordered the case to be reopened to prove that Mobil was a domestic corporation. The attorneys for the respective parties then entered into a stipulation that petitioner, was at the time the dealer agreement and lease were executed and at the time of the commencement of this proceeding, a corporation duly organized and existing under and by virtue of the laws of the State of New York.
Petitioner places great reliance on the Division of Triple T. Serv. v. Mobil Oil Corp. case (60 Misc 2d 270, affd. 34 A D 2d 618), and suggests that this case is governed by that decision. I disagree. The fact pattern of both cases is different. In the Triple T case the defendant sought to terminate a lease with á service station dealer upon 90 days’ notice for the sole purpose of converting the property into a diagnostic and repair service center. None of the issues raised in this case were before the court when it decided the Triple T case. The service station dealer in the Triple T case had executed a retail dealer agreement and a three-year lease. Also, both cases involve gasoline service station franchises.
The court, while holding that the retail dealer contract and lease were nondistinguishable and therefore must be read as one, sought to apply the Uniform Commercial Code, and reached the conclusions that the code would only apply to the retail dealer contract and not to the lease, and therefore even if the court *396 were able to separate the two agreements, the lease would still ■be enforceable. The court faced with the problem that no other statutes were applicable, was forced, “ despite the apparent inequities,” to dismiss plaintiff’s motion and to grant defendant’s motion dismissing the action. In so doing, the court called for the enactment of appropriate legislation to end these “ inequities ” and stated that “ this very case may provide the stimulus necessary to enactment.” Unfortunately, this call has not been heard by our Legislature, but has been heard in other States, including the State of N^ew Jersey which has enacted: The Franchise Practices Act, N. J. Stat., § 56:10-1 (eff. Dec. 21, 1971).
The court, throughout its opinion, cites circumstances which might cause it to reach a different conclusion, but dismisses each because the facts do not make them applicable. A close look at each of these points will show that the case at bar is clearly distinguishable from the Division of Triple T case and that its decision should not govern this court in reaching a decision on the case at bar.
■¡s First, the cause of action in the Triple T case was for a perImanent injunction to restrain defendant, lessor, from terminatling a franchise agreement.. This case involves a holdover proceeding in which equitable affirmative defenses have been interposed and credible evidence given to support them, thus creating issues of fact that were not present in the Division of Triple T case.
Second, the court there stated (60 Mise 2d 720', 722): “ Plaintiff thereafter learned that defendant’s proposed reason for termination is its desire to convert the property into a diagnostic and repair service center.” In this case petitioner does not offer any evidence of converting the use of the property. In | fact, he does not offer any reason other than he wants to termi^nate without cause, his relationship with the respondent. On the other hand, respondent has offered credible evidence to show that petitioner seeks to terminate the dealer contract and lease because the respondent failed to, be a party to practices that are both illegal and against public policy. These practices will be discussed by the court in another part of this decision.
Third, the court stated (p. 722): “ Furthermore, no questions of fraud,, duress, deceit, coercion, mistake, misrepresentation, or ignorance are raised. ’ ’ These issues have not only been raised by the respondent, and not refuted by the petitioner in this case, but go to the very heart of the action before the court,.
*397 Fourth, the court stated (p. 724): “ Plaintiff offers for the court’s consideration a plethora of cases concerning price fixing and restraint of trade, which is not this case ’ ’. One of the major issues in the case before this court is price fixing and restraint of trade and their effect upon the relationship of the parties.
Fifth, the court stated (pp. 720, 721): “ Plaintiff was obligated to purchase various petroleum products and automobile accessories from defendant ”. The court, however, did not discuss the issue of coercing a dealer into purchasing his accessories from the company. This practice has been declared an illegal restraint of trade by the United States Supreme Court, and is a critical issue in this case.
Sixth, the court stated (p. 721): “ Plaintiff deposited $1,500 as security, which sum was returnable to him upon termination of the agreements ”. In this case, the respondent did not deposit cash, but was required by Mobil to deposit 14 shares of Mobil stock as security. This requirement is set forth in the printed form security rider attached to the lease.. The court will discuss the effect of this action in another part of the decision.
For the reasons set forth above, this court finds that the facts presented, and the issues raised by respondent clearly distinguish this case from the Division of Triplo T case.
This court has done extensive research in the field of franchising and its abuses and finds that while franchising accounts for approximately 90 billion dollars in annual sales, 10% of the gross national product and 25% of all retail sales, the franchise industry is practically unregulated by statutory or common law. This is especially true in our own State. Therefore, this court has turned to the Federal court system for eases and guidelines that may assist the court in deciding the case before it. This court has also read many law review articles and theses on the subject of franchising practices by recognized experts in the field and has reviewed the records of various Congressional hearings;
The first question that this court must answer is whether the relationship between Mobil and Rubenfeld is one of purely lessor-lessee or one of franchisor-franchisee. D. Dixon, in his article, The Impact of Recent Antitrust Decisions Upon Franchise Marketing (17 Michigan State University Business Topics [Spring 1969], p. 69) defines a franchise as a contractual relationship under which the franchisee is granted, in return for certain fees, the right to market the franchisor’s goods or services under the franchisor’s trade name, trade-mark or service mark, in accordance with the tested uniform procedures and methods prescribed by the franchisor and is to receive eontinu *398 ing assistance from the franchisor in the form of operational guidance, co-ordinated advertising, research and development, quality purchasing, training and education and other specialized management resources. Section 3 of the New Jersey Franchise Practices Act defines a “ franchise ” as any: written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name or trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement or otherwise ”.
In the case of Shell Oil Co. v. Marinello (N. J. Super., Bergen County, Law No. 1.31431-71 and Chancery No. C3Ó9A-71, decided July 21, 1972), a case with similar facts, the court laid to rest the oil companies’ argument that since gas station dealers are not required to make a capital payment for their franchise and are only required initially to purchase a small amount of TBA in order to go into business, they are merely lessees, with no goodwill in their dealerships. The court in holding unconscionable the oil company’s termination of a gasoline station dealership and the attempted eviction of the dealer under the intimately related sublease stated (p. 21):
“ The fact that Shell here asserts its rights as a landlord to terminate a lease is not the end of the inquiry. It is now recognized that a lease is simply a species of contract which happens to concern real estate, and we must determine under principles of contract law the construction of the document in question in a.manner consistent with the true intent and purpose and the reasonable expectations of the parties as suggested not only by the contents of the instrument but the whole of the relationship that existed between them * * *
“ Furthermore, it should be apparent that we are not dealing here with a traditional landlord-tenant relationship but with what is essentially a form of commercial venture — a franchise — for the marketing of Shell’s products in which both parties have a common interest and profit from the activities of the other. Shell’s- interest in these premises is obviously more than the interest of a landlord, and Marinello’s interest transcends that of a tenant — his investment and very livelihood depend on his remaining within the good graces of Shell’s local .employees who, as the record here demonstrates, exercise final and absolute authority over his tenure as a Shell dealer ”.
The oil companies’ protestations that they are not franchisors are wholly inconsistent with their licensing of their trade names, and trade-marks and their exercise of quality controls *399 over their use. The licensing provisions and quality controls are found in section 6 of the retail dealer agreement executed by Mobil and Rubenfeld. Their position is also inconsistent with their policy of inspections of the service station for any reason (right of inspection is found in paragraph 7 of respondent’s lease) and the promotion of their products (paragraph 6 of respondent’s dealer agreement).
The respondent in this case entered into a written arrangement for a definite period of time (retail dealer contract and lease, both for a three-year period). Respondent was required by Mobil to undergo a period of dealer training. Petitioner granted to Rubenfeld the right to use its trade-mark. Petitioner had representatives visit respondent’s station for the purpose of encouraging the sale of Mobil’s products, inspecting the station and making “recommendations ” concerning the price at which respondent should sell his gasoline, the source from which he should purchase his automotive accessories and even whether he should continue to provide AAA service. Respondent’s rent and to some extent his profits, were dependent on the amount of gasoline he sold. His profits were also determined by the amount of services he provided and the goodwill he created.
It is obvious, and the court finds that the 17-year relationship between the parties transcended that' of lessor-lessee and was one of franchisor-franchisee.
The court also notes that throughout the Divison of Triple T case, the court referred to the retail dealer contract as a franchise.
Having established that the agreements before the court constitute a franchise, the court must now determine what the relationship of the parties is under these agreements.
Many noted authors have suggested that the relationship 7 , between the parties in a franchise is fiduciary in nature. The "7¡ term fiduciary is derived from the Roman law, and means a person holding the character of a trustee, or a character analogous to that of a trustee, in respect to the trust and confidence involved in it and the scrupulous good faith and candor which it requires (Black’s Law Dictionary, 4th ed., 753).
A fiduciary relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another. The term is a very broad one. It is said that the relation exists, and that relief is granted in all eases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical *400 fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. Out of such a relation, the law raises the rule that neither party may exert influence or pressure upon the the other, take selfish advantage of his trust or deal with the subject-matter of the trust in such a way as to benefit himself or prejudice the other except in the exercise of the utmost good faith and with the full knowledge and consent of that other, business shrewdness and hard bargaining being totally prohibited as between persons standing in such a relation to each other. A fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other.
There do not appear to be any American cases that have either applied or rejected the fiduciary theory to franchises. However, Harold Brown, in a well-researched article on franchising and equity (H. Brown, “Franchising — A Fiduciary Relationship ’ ’, 49 Texas L. Rev., 650 [April, 1971]) points out that the fiduciary nature of the franchise relationship was recently informally recognized by the Federal Trade Commission, the agency perhaps most intimately familiar with franchising and statutorily concerned through its obligation to prevent unfair methods of competition. The General Counsel of the FTC stated: ‘ ‘ Franchisors frequently speak of their relationship with their franchisees as being one of trust and confidence. It is truly a fiduciary relationship ”. (Hearings on the “Impact of Franchising on Small Business ” before the Subeomm. on Urban and Rural Economic Development of the Senate Select Comm, on Small Business, 91st Cong., 2d Sess. 143, 1970, statement of John V. Buffington, Gen. Counsel, F.T.C.)
A Canadian court has recently considered the applicability of fiduciary obligations to franchising in Jirna, Ltd. v. Mister Donut of Canada, Ltd. (3 Ont. 629 [1970]), a case of first impres- / sion. Significantly, the Ontario court, without the aid of the American antitrust laws, was constrained to address itself to basic equitable concepts. After a painstaking analysis of the franchisor’s contractual and practical control over every aspect of the franchisee’s business, it had little difficulty finding the existence of fiduciary duties and. constructive fraud in the franchisor’s secret retention of commissions and rebates from vendors with whom the franchisees were required to deal. While relying on cases such as Meinhard v. Salmon (249 N. Y. 458), and Broomfield v. Kosow (349 Mass. 749), the court found nothing new in the principles sought to be imposed. It concluded : “ In this particular type of relationship it appears *401 * * * that franchisor and franchisee are bound together over a long period of years in a relationship which in many respects is almost as close as that of master and servant. While of course it is not the same nevertheless the relationship is so close that confidence is necessarily reposed by the one in the other ”. The abuse of that confidence through self-preference was held actionable by the court.
The United States courts, while not discussing fiduciary relationships in franchise cases, have discussed the unequal bargaining powers between the parties in great depth, and have reached the same basic conclusions as the Canadian court: that confidence is necessarily reposed by the dealer in the oil company and that any abuse by the oil company of its resulting superiority and influence is both prohibited and actionable.
The disparity between the parties and the necessary reliance of the dealer upon the oil company was vividly expressed by Judge Wisdom in Shell Oil Co. v. Federal Trade Comm. (360 F. 2d 470, 487, cert. den. 385 U. S. 1002), when he stated: “ The relationship of a major oil company to its service station dealer goes beyond the bigness-littleness antithesis that exists in innumerable contract negotiations and in the operations of a modern, large business'. The inherent leverage a major oil company has over its dealers results from the market structure of the industry and the special dependence on the company of the service station dealer (who is usually also a lessee) * * * A man operating a gas station is bound to be overawed by the giant corporation that is his supplier, his banker, and his landlord. When he hears that Shell will benefit from his patronage of sponsored TEA outlets, the velvet glove of request has within it the mailed fist of command. His interest in catering to Shell’s sponsorship of certain TEA will be especially strong when the time for lease renewal approaches (once a year) or when a change in rental or commission appears in sight. The run of the mill service station dealer is a man of limited means who has, for him, a sizable investment in his station. Much of the value of that investment is in goodwill attached to the gasoline he sells, the TEA he stocks, and the location of the station where he sells these products. While it is true that it is expensive, for Shell to switch dealers, it is far more expensive, in relative terms, for a dealer to lose his station.”
Judge Wisdom’s words' vividly demonstrate the marked imbalance in the relationship of the parties as well as the severity of the franchisee’s reliance oñ the franchisor. The United States Supreme Court in Atlantic Refining Co. v. Federal Trade Comm.
*402 (381 U. S. 357), upheld a ruling by the F.T.C. which found that an agreement between a gasoline distributor and tire manufacturer under which the former sponsored the sales of tires, batteries and accessories (TBA) of the latter to its retail Service station dealers was an unfair method of competition in violation of the Federal Trade Commission Act. Mr. Justice Clabk attacked the unequal bargaining positions of the oil company and its dealers and described some of the reasons for the oil companies’ dominance when he said (p. 368): “Certainly there is warrant in the record ’ for the findings of the Commission here. Substantial evidence supports the conclusion that notwithstanding Atlantic’s contention that it and its dealers are mutually dependent upon each other, they simply do not bargain as equals. Among the sources of leverage in Atlantic’s hands are its lease and equipment loan contracts with their cancellation and short-term provisions. Only last Term we described the power implication of such arrangements in Simpson v. Union Oil Go., 377 IT. S. 13 (1964), and we need not repeat that discussion here. It must also be remembered that Atlantic controlled the supply of gasoline and oil to its wholesalers and dealers. This was ,an additional source of economic leverage, United States v. Loew’s, Inc., 371 U. S. 38, 45 (1962), as was its extensive control of all advertising on the premises of its dealers.” (See, also, United States v. Bethlehem Steel Corp., 315 U. S. 289; Lessig v. Tidewater Oil Co., 327 F. 2d 459; Federal Trade Comm. v. Texaco, 393 U. S. 223; Weaver v. American Oil Co., 276 N. E. 2d 144 [Indiana Supreme Ct.]).
The United States Supreme Court, in Atlantic Refining Co. v. Federal Trade Comm, (supra), referred to three sources of an oil company’s power over its dealers; (1) control of the dealers’ oil and gasoline supply; (2) control over dealers through short-term leases and equipment loan contracts renewable year-to-year and terminable at year’s end upon 10 days’ notice; (3) control over advertising on the premises of service stations.
The same characteristics of the company-dealer relationship described in these cases are present here. Mobil’s employees represented to Bubenfeld that he would be building a good future for himself and his family and that he would be an independent businessman. Over a period of 17 years, respondent invested large sums of money at two service stations and as a result of his labor and the goodwill he created, he always operated both .stations at a profit. Throughout this time, Mobil always tendered toJaim dealer agreements, equipment loan contracts and leases which ran for one- or three-year terms, always on *403 printed forms prepared by Mobil, and effectively reserving to Mobil the “ mailed fist of command ” within the “ velvet glove Mobil never allowed Rubenfeld to be represented by counsel, thus forcing him to rely on their integrity. It is clear from the record that Mobil had complete control over Bubenf eld’s oil and. gasoline supply. Bubenf eld’s only real asset was the increasing value of the goodwill he created. Surely no person would make the kind of investment in_moneyi timeand effort as did Bubenfeldjyithuut — the'reasonable expectationlhaf if he substantially performed — his obligations to Mobil, the-Iatter would in turn continue to renew-hisdease-andrdealéfship. Rubenfe}d was, by virtue of Mobil’s dominant position in their relationship and legal structure of the agreements whose terms he could.not vary, compelled to rely upon Mobil’s good faith in living up to their expectations. Another example of Mobil’s dominant economic power is found in its compelling Bubenf eld to post 14 shares of Mobil stock as security for his lease. By requiring its dealers to deposit shares of Mobil stock instead of cash as security, Mobil provides its dealers with an incentive to do everything they can to insure that the net worth of the corporation will not decrease, thus closely binding the dealers’ prosperity with the prosperity of Mobil. Conversely, a dealer would be constrained from bringing an action against Mobil or protesting to any governmental agencies, for fear that such actions would result in a decrease of the value of their stocks and thus cause a loss in their investment. This requirement was an invitation by Mobil for its dealers to place their confidence in Mobil’s integrity, and is further evidence of the fiduciary relationship that existed between the parties.
In a recent Massachusetts case, Broomfield v. Kosow (349 Mass. 749, supra), the court found a fiduciary obligation not after the contract had been signed but at its very signing. The fiduciary duty arose when trust and confidence, were reposed in the defendant and the latter had knowledge of this reliance. Although the case involved a claim by a nursing home operator against a lender-builder, the theory is directly applicable to franchising in its reliance on the great disparity of the parties, the intimacy of their relationship, and the complexity of the transaction (H. Brown, 49 Texas L. Bev. 650, 665, supra). The court concluded {supra, p. 755): “ In redressing an abuse of trust and confidence equity will review such factors as the relation of the parties prior to the incidents complained of, the plaintiff’s business capacity or lack of it contrasted with that of the defendant, and the readiness of the plaintiff to follow the defendant’s *404 guidance in complicated transactions wherein the defendant has specialized knowledge. Equity will, in sum, weigh whether unjust enrichment results from the relationship
Eubenfeld and Mobil were bound together for 17 years. Mobil always controlled the supply and wholesale price of its trademarked items which it sold to Eubenfeld. Section d of paragraph 7 of the printed form lease gave Eubenfeld the right to use Mobil’s trade-mark (also paragraph 6 of retail dealer’s contract) and required him “ to keep legible and visible all brand names, trademarks and signs of Landlord (Mobil) on Landlord’s pumps, containers, and equipment now or hereafter placed on the premises and to use such pumps, containers, and equipment solely for Landlord’s products.” Mobil representatives always visited Eubenfeld’s service station for the purpose of inspection, guidance and to promote the sale of Mobil’s-products. Mobil’s right of inspection is found in section e of paragraph 7 and states: “ To permit Landlord to enter the premises to make inspections, to post notices or for any other purpose without liability for any interference with tenant’s business ” (emphasis ours). Eubenfeld had no choice, but to follow Mobil’s “ guidance ”. To dare not to, would mean the termination of his lease and agreement. Mobil’s initial representation to Eubenfeld that he would be an “independent businessman” was a fraudulent misrepresentation of fact. At the core of their franchise relationship was the contractual control exercised by Mobil over Eubenfeld’s business. While Eubenfeld invested his cash, time and effort in the business enterprises, the entire business remained under the essential control of Mobil both in law and in fact. It is not difficult to infer that the colloquialism, independent businessman, ’ ’ imports the concept of a property interest as well as the normal attributes of such a vested interest. It would also appear to include ownership of whatever goodwill the dealer develops. The United States Court of Appeals in Milsen Co. v. Southland Corp. (454 F. 2d 363) granted a preliminary injunction against the termination of a franchise agreement where the franchisee had no adequate remedy at law and would be irreparably harmed if the injunction did not issue. At page 366, the court, in reviewing decisions made by other circuit courts regarding vested interests stated: ‘ ‘ These cases recognize the vested interest a franchisee builds in his business through years of effort and expenditure, as noted by this Court in Beloit Culligan Soft Water Service, Inc. v. Culligan, Inc., 274 F, 2d 29, 34 (7th Cir, 1959),”
*405 This court finds that because of Mobil’s dominant economic position in their relationship with the respondent and its power to control the operation of the defendant’s business, there exists a fiduciary relationship and that the respondent possesses a vested interest in his franchise.
It is the further opinion of this court that the following principles be applied to franchises when the relationship of the parties is characterized by the franchisors’ pervasive power of control over the franchisee: (1) When one has power to control another, a fiduciary obligation exists; (2) a fiduciary’s duty is coextensive with his power to control; and (3) when the power to control another is abused by preference of self, equity will intervene.
The final question that confronts this court is whether or not, considering the fiduciary relationship between the parties, their respective bargaining positions in their dealings, their course of conduct over an extended period of time, and what may be characterized as the reasonable expectations of the parties in this situation, Mobil can, without cause or justification, terminate the relationship and evict the respondent from this station.
Some 36 years ago, Professor Williston declared that “ in every contract thére exists an implied covenant of good faith and fair dealing” (Williston, Contracts, § 1926 [1936]). This principle has been adopted and expanded by the courts in our State. In Lutz v. Bayberry Huntington, Inc. (148 N. Y. S. 2d 762) the court emphatically declared: “ In every contract there is an impled covenant that neither party will do anything'having the effect of destroying or injuring the right of the other party to receive the fruits of the contract”. (See, also, Gibbs v. Bardahl Oil Co., 331 S. W. 2d 614 [Mo., 1960]; Beebe v. Columbia Axle Co., 233 Mo. App. 212.)
The dominant economic power of Mobil over its dealers is evident. The question is whether Mobil has used this power in a manner that breaches its. obligation of good faith.
Eubenfeld testified that in 1971 and 1972 he did not purchase his TEA from Mobil. He found that he could purchase comparable TEA from other suppliers at a lower price. An example of this was the fact that he was able to purchase tires of a quality equal to Mobil’s at a savings of 20%. Eubenfeld testified that a Mobil sales representative named Pedigrew warned him on different occasions in 1971 and 1972 that unless he resumed purchasing his TEA from Mobil his lease would not be renewed. The Federal Trade Commission, the United States Supreme Court and other Federal courts have held that it is illegal for *406 an oil company to require its dealers to purchase TBA from ■them. (See Atlantic Refining Co. v. Federal Trade Comm., 381 U. S. 357; Shell Oil Co. v. Federal Trade Comm., 360 F. 2d 470, cert. den. 385 U. S. 1002; Lessig v. Tidewater Oil Go., 327 F. 2d 459; Osborne v. Sinclair Refining Co., 324 F. 2d 566; Albrecht v. Herald Co., 452 F. 2d 124; see, also, C. Hewitt, “ Termination of Dealer Franchises ”, 22 Business Lawyer 1075 [1967]; J. Bay, “ Current Franchising Problems,” ABLA [1970]; H. Brown, “ Franchising: Fraud, Concealment and Full Disclosure,” Ohio State L. J., Summer, 1972, pp. 535-537.)
Paragraph 1 of Mobil’s retail dealer contract with Bubenfeld sets forth the required minimum and maximum purchase requirements of Mobil products, including TBA. This court notes that the requirements part is left blank and that no purchase requirements rider is attached. Nevertheless, Mobil, through the use of coercion sought to have Bubenfeld resume purchasing TBA from them. Something that he was not required to do by contract or by law. A practice which has been condemned in our judicial system. It is interesting to note that the United States Supreme Court in Federal Trade Comm. v. Texaco (393 U. S. 223, 228-229) confirmed a finding of unfair methods of competition under section 5 of the Federal Trade Commission Act against Texaco with regard to the compulsory purchase of tires, batteries and accessories, in spite of the complete absence of any evidence of overt directions by the oil company. The decision was based on the “dominant economic power” of the company and dealers’ knowledge of the fact that unless they purchased TBA from Texaco specified sources their short-term dealerships would not be renewed. In the case at bar, there is unrefuted evidence of “ overt directions ” by Mobil to purchase its TBA, coupled with the naked threat of termination of a 17-year relationship if respondent didn’t co-operate. This illegal course of conduct by Mobil is a breach of its duty of good faith towards Bubenfeld.
Mobil’s use of its dominant economic power over Bubenfeld did not stop there. Bubenfeld testified that in the latter part of 1971, he had a conversation with Pedigrew concerning the price at which respondent sold his gasoline. Mobil wanted Bubenfeld to reduce the price of his gasoline and accept ‘ ‘ Dealer Temporary Aid ” (DTA). The DTA formula was .7 of 1% for every penny that the respondent would reduce his price. For example, if respondent would reduce his price 5 cents per gallon, he would receive 3.5 cents per gallon from Mobil. Bespondent testified that he told Pedigrew that he could not *407 lower his prices because of the loss he would suffer. Bubenfeld testified that Pedigrew’s response was that his action jeopardized the renewal of his lease.
The record indicates that on April 7,1972, Bubenfeld testified that he had a conversation with a Mr. Candeloro, Mobil’s district sales manager, regarding the price at which respondent was selling his gasoline. Bubenfeld testified that Candeloro warned him that he was an unco-operative dealer and that he must fall in line with Mobil’s price policy or his lease would not be renewed. He also testified that Candeloro told him that his gasoline prices were out of line with the prices set by Mobil for his geographic area and that he .should lower his sales price to 41.9 cents per gallon without DTA, and then further reduce it from time to time, at Mobil’s direction with the help of DTA. The record also indicates that Candeloro told him that if he complied with this “ request ” and a list of other requests, his lease would be renewed in September. Bubenfeld stated that he asked Candeloro to write down the list of things he was to do. This list was admitted in evidence.
The marketing of gasoline is subject to Federal anti-eompetitive legislation such as the Sherman Act (U. S. Code, tit. 15, § 1 et seq.; see Broussard v. Socony Mobil Oil Co., 350 F. 2d 346); ■the Clayton Act (TJ. S. Code, tit. 15, § 12 et seq.); and, the Bobinson-Patman Act (TJ. S. Code, tit. 15, § 45, subd. [a], par. [1]). It is a well-settled principle that the oil company cannot force its dealer to sell at prices fixed by the distributor. This principle was expressed by the United States. Supreme Court in Simpson v. Union Oil Co. (377 U. S. 13, 17, petition for rehearing den. 377 U. S. 949) when Mr. Justice Douglas stated: “ We made clear in United States v. Parke Davis & Co., 362 U. S. 29, that a supplier may not use coercion on its retail outlets to achieve resale price maintenance. We reiterate that view, adding that it matters not what the coercive device is.”
This principle was applied by the United States Court of Appeals in Guidry v. Continental Oil Co. (350 F. 2d 342) to a case involving an action for treble damages, resulting from oil companies’ failure to renew a dealer’s lease because the dealer would not comply with the demands of the company that he reduce his retail prices for gasoline. The court stated (p. 344) : “ The coercive device in Continental’s hands is its ‘ Supplemental Bailment Agreement ’ and lease with its short-term and cancellation provisions which may be used effectively to terminate not only the plaintiff’s gasoline supply, but his whole * * * business. Such devices promise to be equally, if not more, effec *408 tive in maintaining gasoline prices than were the techniques in fixing monopoly prices on drugs in United States v. Parke, Davis & Co., 1960, 362 U. S. 29, 80 S. Ct. 503, 4 L. Ed. 2d 505.” (See, also, Atlantic Refining Co. v. Federal Trade Comm., 381 U. S. 357, supra; Broussard v. Socony Mobil Oil Co., supra; Susser v. Carvel Corp., 206 F. Supp. 636, 649).
In Lessig v. Tidewater Oil Co. (327 F. 2d 459, supra), the court held actionable the cancellation of dealer’s lease and contract because the dealer failed to adhere to a resale price fixing scheme created by the oil company.
The petitioner in this case takes the position that its conduct is merely a lawful refusal to do business with the respondent. This theory was discussed and rejected in Osborne v. Sinclair Refining Co. (324 F. 2d 566, 569, supra). “ Sinclair’s principal defense in the former- appeal was that its above-described conduct merely amounted to a unilateral refusal to deal, lawful under the principle that a seller may choose his customers as he sees fit. Cf. United States v. Colgate & Co., 250 U. S. 300, 39 S. Ct. 465, 63 L. Ed. 992 (1919). However, as was pointed out in our earlier opinion, a seller’s right not to deal with a particular buyer has been limited; for if the seller, in order to secure adherence to policies of price maintenance, tying arrangements, or similar suppression of competition, uses means that go beyond a. simple announcement of policy and declination to sell, his conduct falls under the proscriptions of the antitrust laws.” (See, also, United States v. Schrader’s Son, 252 U. S. 85, 99-100; Federal Trade Comm. v. Beech-Nut Co., 257 U. S. 441, 452-453; Times-Picayune v. United States, 345 U. S. 594, 625; United States v. Parlce, Davis & Co., supra; Albrecht v. Herald Co., 452 F. 2d 124, supra; Pearl Brewing Co. v. Anheuser-Busch, 339 F. Supp. 945).
It has been established beyond any possibility of dispute that agreements fixing prices are illegal under the antitrust laws and that such violations are actionable in private antitrust suits for treble damages. Before the dealer can avail himself of a treble damage suit he must first show loss. This, of course, usually occurs when his franchise and lease are terminated. However, termination is a finality. His business and many yéars of hard work and the resulting goodwill are lost. No monetary award could replace this. Petitioner in his brief asserts the argument that if Mobil did seek to illegally fix or control the retail prices of gasoline sold by the respondent, he could seek relief after termination of his agreements in an action for treble damages.
*409 The United States Court of Appeals rejected this argument in Milsen Co. v. Southland Corp. (454 F. 2d 363, 366, supra):
‘ ‘ Many courts have held that defendants who are or may be guilty of anti-competitive practices should not be permitted to terminate franchises, leases or sales contracts when such terminations would effectuate those practices. Semmes Motors, Inc. v. Ford Motor Co., 429 F. 2d 1197 (2d Cir. 1970); Sahm v. V-l Oil Co., 402 F, 2d 69 (10th Cir. 1968; Broussard v. Socony Mobil Oil Co., 350 F. 2d 346 (5th Cir. 1965); Bergen Drug Co. v. Parke, Davis & Co., 307 F. 2d 725 (3rd Cir. 1962); Bateman v. Ford Motor Co., 302 F. 2d 63 (3rd Cir. 1962); Interphoto Corp. v. Minolta Corp., 295 F. Supp. 711 (S. D. N. Y.), affd. 417 F. 2d 621 (2d Cir. 1969); Wurzberg Brothers, Inc. v. Head Ski Co. 276 F. Supp. 142 (D.N.J. 1967); Madsen v. Chrysler Corp., 261 F. Supp. 488 (N.D. 111. 1966), vacated as moot, 375 F. 2d 773 (7th Cir. 1967); McKesson & Robins, Inc. v. Charles Pfizer & Co., 235 F. Supp 743 (E.D. Pa. 1964).
“ The most common situation is a suit by an automobile dealer under the ‘ Dealers Day in Court Act, ’ which provides for damages only. In reversing the denial of a preliminary injunction against termination of one such dealership, the Third Circuit Court of Appeals said: ‘ A judgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who . . . has had a . . . franchise since 1933. ’ * * * The Second Circuit expressed a similar sentiment in Semmes, supra, 429 F. 2d at 1205: ‘ [Franchisees] want to sell automobiles, not to live on the income from a damages award.’ ”
These cases recognize the franchisees’ vested interest in his franchise and vividly demonstrate the wrong that this court would be doing if it finds for the petitioner in the case at bar, when it has before it unrefuted evidence of illegal coercive practices by Mobil to foster the sale of its TBA and to illegally attempt to control the retail price of gasoline at respondent’s service station.
See United States v. Bethlehem Steel Corp. (315 U. S. 289, 326, supra) where Mr. Justice Fbaxkfubteb said:
“ But is there any principle which is more familiar or more firmly embedded in the history of Anglo-American law than the basic doctrine that the courts will not permit themselves to be used as instruments of inequality and injustice? Does any principle in our law have more universal application than the doctrine that courts will not enforce transactions in which the relative positions of the parties are such that one has uncon *410 scionably taken advantage of the necessities of the other?
“ The law is not so primitive that it sanctions every injustice except brute force and downright fraud. More specifically, the courts generally refuse to lend themselves to the enforcement of •a bargain ’ in which one party has unjustly taken advantage of the economic necessities of the other.”
Based on the. evidence presented, this court finds that the relationship between the parties transcended that of lessor-lessee and was one of franchisor-franchisee, in which Mobil had a fiduciary obligation to act in good faith in its dealings with Bubenfeld who had a vested interest in his franchise, and that it breached its fiduciary duty when it sought, through the exercisé of its dominant economic power to coerce Bubenfeld into illegally fixing his gasoline prices, and to illegally force him to purchase TBA from Mobil in violation of the Federal antitrust laws. The court also finds that respondent has established by a fair preponderance of the credible evidence, that the reason petitioner would not renew the retail dealer contract .and lease was because respondent failed to follow practices that are illegal and against public policy. Therefore, Mobil’s petition is dismissed with costs for respondent.