MOBIL OIL CORPORATION, Appellant, v PAUL RUBENFELD, Respondent.

Second Department, July 7, 1975

*Bleakley, Platt, Schmidt & Fritz (Frederick J. Martin* and *Michael J. Trainor* of counsel), for petitioner.

*Anderman, Povman & Warren (Morton Povman* of counsel), for respondent.

*Louis J. Lefkowitz, Attorney-General (Terrence M. Kelly, Samuel A. Hirshowitz* and *Charles A. La Torella, Jr.,* of counsel), *amicus curiae.*

HOPKINS, J. The question before us is whether a tenant under a lease of commercial property—a gasoline service station—may defeat the landlord, seeking possession of the premises at the end of the term, by asserting a retaliatory defense that the landlord failed to renew the lease because the tenant resisted the landlord's actions in enforcing tie-in and price-fixing agreements in violation of the antitrust laws. The Civil Court held that the retaliatory defense was valid and dismissed the petition *(Mobil Oil Corp. v Rubenfeld,* 72 Misc 2d 392); that judgment was affirmed by the Appellate Term by a divided court *(Mobil Oil Corp. v Rubenfeld,* 77 Misc 2d 962). We reverse and grant judgment in favor of the petitioner. A retaliatory defense based upon such circumstances does not lie. A violation of the antitrust laws by a landlord, under a dealer agreement concurrent with the lease, does not result in a continuing obligation on the landlord to remain in a contractual relationship with the tenant.

The petitioner was the lessee of a gasoline service station located in Queens. It subleased the premises to the respondent for a term of three years, ending on September 30, 1972. This was not the first leasing transaction between the parties. The respondent had previously been a tenant under a lease from the petitioner at another service station in Queens. Originally, the term and dealer agreement accompanying the lease ran for a year; thereafter, there were three renewals of the lease and the agreement, each for a term of three years.

In 1965 the petitioner leased the present service station to the respondent for a term of one year, simultaneously with the execution of a dealer agreement for the same period. For a time the respondent operated both stations; he surrendered the original station to the petitioner after six months. Upon the expiration of the one-year term for the present station, a lease and dealer agreement were executed by the parties for a three-year term; both were thereafter renewed for a three-year period, ending, as has been said, on September 30, 1972.

The petitioner notified the respondent prior to the expiration date that the lease would not be renewed. The respondent did not vacate the premises, and this holdover proceeding to obtain possession was then instituted by the petitioner.

The respondent interposed several defenses, only two of which need discussion. The fifth defense alleges that the lease may not be terminated in the absence of good cause, and that the agreements between the parties are unconscionable. The sixth defense alleges that the petitioner is attempting to coerce the respondent through efforts to fix the price of gasoline and that the failure to renew the lease arises because the petitioner has not submitted to that coercion.

After the trial, the Civil Court (KASSOFF, J.) found that the business relationship between the parties was not merely lessor-lessee, but rather franchisor-franchisee; that inherent in such relationship was a fiduciary obligation imposed upon the petitioner toward the respondent; and that the petitioner exercised undue and illegal economic power over the respondent through its violations of the antitrust laws, disabling the petitioner from refusing to renew its relationship with the respondent, since thereby its fiduciary obligation would be breached. Implicit in these findings were factual findings by the court that the petitioner had practiced illegal conduct against the respondent and that the lease and agreement were not renewed because of the resistance of the respondent to that illegal conduct.

The majority at the Appellate Term (GROAT, P. J., and SCHWARTZWALD, J.) held, however, that the violation of the antitrust laws supported a defense to the eviction on the ground that public policy would not permit the enforcement of a contractual right when an illegal objective would, as a consequence, be promoted. The Justice dissenting (MARGETT, J.) decided that the denial of the remedy of eviction in effect worked the renewal of the lease "for an indefinite period and at an unspecified rental", thus amending the contract of the parties, and that the injustice in the case could be redressed only by legislation (Mobil Oil Corp. v Rubenfeld, 77 Misc 2d 962, 964, supra). Neither the majority nor the dissenting Justice discussed the status of the parties as franchisor-franchisee.

On this appeal, our scope of review includes both law and facts (CPLR 5501, subd [c]). It is obvious that the questions of law are significant both in the private and public sectors, and

that both the Civil Court and the Appellate Term have confronted these questions in scholarly and conscientious opinions. For the purposes of this appeal, we accept the findings of fact made by both courts.[1]

The rights arising out of real property law have ancient bases; any change in these rights is customarily achieved by legislative or constitutional enactment. Under ordinary circumstances, a landlord is not obliged to renew a lease *(Robinson v Jewett,* 116 NY 40, 51; *Thayer v Leggett,* 229 NY 152, 158), even though the tenant may have invested capital and energy in the expectation of renewal. Nor, in the absence of statute, may one contracting party be compelled to deal with the other beyond the contract term (cf. *Brown v Retsof Min. Co.,* 127 App Div 368). In New York, one class of contracts has been separated by the Legislature for different treatment—the contract between manufacturer and dealer for the sale of new motor vehicles (General Business Law, § 197-a). In that class, the statute provides that such a contract cannot be terminated, save in good faith. A broader bill, covering all franchises of goods and services, was enacted by the Legislature but did not become law due to the disapproval of the Governor (S. 4915, 1969; Governor's Memorandum dated May 26, 1969; see discussion by Justice GAGLIARDI in *Division of Triple T Serv. v Mobil Oil Corp.,* 60 Misc 2d 720, 725, affd 34 AD2d 618). Hence, it must be concluded that the termination of leases and franchises, save for manufacturer-dealer contracts for the sale of motor vehicles, is to be judged in the light of the traditional principles of real property and contract law.

This does not mean that the dealer contract should not be considered with the lease as component parts of a whole transaction; clearly, the parties were concerned with the primary object of the sale of petroleum products. The lease becomes significant because of the presumably favorable site

---

1. We further note that the price-fixing and tie-in arrangements have been determined to be breaches of the antitrust laws (see e.g., *Northern Pacific RR Co. v United States,* 356 US 1, 6; *Tampa Elec. Co. v Nashville Co.,* 365 US 320, 328–329; cf. *Times-Picayune v United States,* 345 US 594, 614; *Siegel v Chicken Delight,* 448 F2d 43; Wheeler, "Some Observations on Tie-Ins, the Single-Product Defense, Exclusive Dealing and Regulated Industries", 60 Cal L Rev 1557, 1558–1559), although some reservations have been voiced concerning a per se violation of the laws by tie-in (Markovits, "Tie-Ins, Leverage, and the American Antitrust Laws", 80 Yale LJ 195, 292–293; 6A Corbin, Contracts, § 1412A). We note, too, that administrative agency trade regulation has occurred in these areas *(Federal Trade Comm. v Texaco Inc.,* 393 US 223; *Atlantic Refining Co. v Federal Trade Comm.,* 381 US 357; *Shell Oil Co. v Federal Trade Comm.,* 360 F2d 470, cert den 385 US 1002).

of the premises to attract purchasers of gasoline; and the dealer contract has importance because it provides the product with the advantages flowing from a readily recognizable trade-mark. Even so, though the law sometimes extracts relationships not intended by the parties (cf. 1 Corbin, Contracts, §§ 3, 9) and though, as Judge KASSOFF pointed out in his opinion, a commentator argues that a fiduciary relationship should exist in franchising agreements (Mobil Oil Corp. v Rubenfeld, 72 Misc 2d 392, 400, supra; Brown, "Franchising— A Fiduciary Relationship", 49 Texas L. Rev. 650), New York has not adopted that concept (cf. Division of Triple T Serv. v Mobil Oil Corp., supra; Texaco Inc. v A. A. Gold, Inc., 78 Misc 2d 1050, affd 45 AD2d 1054). Nor does it appear in this case that it is necessary to infer a fiduciary relationship, when the issue is not a breach of the lease or the contract by the petitioner, but simply a refusal to extend the term beyond that stated in the lease.

The question in this appeal, accordingly, is narrowed to that aspect of the case to which the Appellate Term addressed itself—may the respondent assert a retaliatory defense based upon a violation of the antitrust laws? The retaliatory defense first was sanctioned in Edwards v Habib (397 F2d 687, cert den 393 US 1016), in which the court held that the effectiveness of the housing code affecting residential properties in the District of Columbia would be frustrated if the tenant could not report violations to the authorities (pp 699–701). Courts in our State have followed this decision with respect to residential housing (e.g., Portnoy v Hill, 57 Misc 2d 1097; Markese v Cooper, 70 Misc 2d 478; Toms Point Apts. v Goudzward, 72 Misc 2d 629, affd 79 Misc 2d 206; Cornell v Dimmick, 73 Misc 2d 384). So far, the defense has not been applied to commercial tenancies.

Here, we are not dealing with the enforcement of laws or codes governing the proper maintenance of buildings to safeguard tenants from injury or impairment of health. In such an instance, the land which is the subject of the lease is, itself, the very target of the legislation. It is plain that the purpose of the legislation to ensure the improvement and repair of unsafe and unsanitary premises will be swiftly realized by the direct remedy of recognizing the defense as available to the tenant.

In the present case the lease (and the land) is peripheral to the objective of the enforcement of the antitrust laws. The

posture of the parties is not unlike that in the cases in which it has been determined that violations of the antitrust laws by the parties are not valid defenses to actions to recover for the price of services rendered or goods sold *(Columbia Broadcasting System v Roskin Distrs.,* 31 AD2d 22, 25, affd 28 NY2d 559;[2] *Samuel Adler, Inc. v Bieler;* 37 Misc 2d 741, affd 20 AD2d 772, affd 16 NY2d 688). In the words of Justice BRENNAN in *Kelly v Kosuga* (358 US 516, 520), "if the defense of illegality is to be allowed as a collateral method of enforcement of the antitrust laws, as the breadth of the petitioner's argument suggests, it must be said that his theory creates a very strange class of private attorneys general."

Usually, the remedy vouchsafed to individuals for violations of the antitrust laws lies in a suit to recover damages for injuries proximately caused by the violations (General Business Law, § 340, subd 5; *Arthur Murray, Inc. v Reserve Plan,* 406 F2d 1138; *Advance Business Systems & Supply Co. v SCM Corp.,* 415 F2d 55, cert den 397 US 920; cf. *Columbia Gas of N.Y. v New York State Elec. & Gas Corp.,* 28 NY2d 117). As Justice MARGETT observed in his dissent *(Mobil Oil Corp. v Rubenfeld,* 77 Misc 2d 962, 964, *supra),* the use of the defense by the respondent imposes a penalty for the violation beyond monetary damages, in effect compelling the petitioner to accommodate the respondent on the premises for a term terminable only by the latter's will.[3]

The right of a service station lessee to damages for violations of the Federal antitrust acts has been recognized *(Osborn v Sinclair Refining Co.,* 324 F2d 566; *Lessig v Tidewater Oil Co.,* 327 F2d 459). On the other hand, the remedy of injunction to require the continuation of a service station lease has been withheld *(Russell v Shell Oil Co.,* 382 F Supp 395; *Hollander v American Oil Co.,* 329 F Supp 1300). We do not consider that the decisions in the neighboring state of New Jersey *(Shell Oil Co. v Marinello,* 63 NJ 402, cert den 415 US 920; *Texaco, Inc. v Appleget,* 63 NJ 411), holding that a service station lease may be terminated only for cause, are persuasive, since the

---

2. It should be noted that the affirmance in the Court of Appeals did not pass directly on the dismissal of the defense by the Appellate Division, First Department.

3. In *Markese v Cooper* (70 Misc 2d 478, 481) it was suggested that the tenant could not remain on the premises beyond the time that the repairs were made. Without such a limitation, the respondent's right approaches a perpetual renewal of a lease (see *Burns v City of New York,* 213 NY 516, 524; *Hoff v Royal Metal Furniture Co.,* 117 App Div 884, affd 189 NY 555); however, the renewal provision must be in precise language to permit such a construction, as these cases hold.

Supreme Court of New Jersey rested its conclusion on public policy exampled by New Jersey statutes expressly prohibiting a franchisor from failing to renew a franchise without cause.[4] As noted above, New York has not adopted that general policy, except in the instance of a motor vehicle dealer, and, indeed, has negatived that general policy by not enacting a statute which would have protected a franchisee by making good cause a prerequisite to termination. Hence, we see no compelling reason to deny recovery of possession of the premises to the petitioner as a means to enforce the antitrust laws. The order appealed from should, therefore, be reversed, and the petition granted.

MUNDER, J. (dissenting). The majority concedes that the price-fixing and tie-in arrangements present in this case are violations of the Federal antitrust laws. There was a finding by the trial court, similarly accepted by the majority, that the reason why the petitioner did not renew the respondent's lease and contract, after a 17-year continuous relationship, was because the respondent had refused to go along with these illegal arrangements (see *Mobil Oil Corp. v Rubenfeld,* 72 Misc 2d 392, 410). In addition, the *amicus curiae* brief submitted by the Attorney-General charges that the petitioner's conduct effects a monopoly or restraint of trade in violation of section 340 of the General Business Law (Donnelly Antitrust Act). This has been declared to be against the "public policy" of New York (General Business Law, § 340, subd 1). Nevertheless, the majority, following "the traditional principles of real property and contract law", are granting the petitioner the relief it seeks. I cannot agree.

As noted in *Division of Triple T Serv. v Mobil Oil Corp.* (60 Misc 2d 720, 728–729, affd 34 AD2d 618), the retail dealership contract and the lease under which a dealer such as the respondent operates are really indivisible. They are *not* separate contractual agreements; it is artificial and improper to treat them as such. We cannot rely exclusively on rights historically grounded in real property law when dealing with the short-term leases indigenous to the service station industry. When an oil company indicates that it wants to terminate a lease it means that it wants to terminate the entire business

---

4. The Supreme Court of New Jersey explicitly stated that it did not reach the question of the equitable defense raised by the tenant claiming that Shell was guilty of price discrimination and tie-in practices. For further developments with respect to the New Jersey franchising laws, see *Mariniello v Shell Oil Co.* (368 F Supp 1401).

relationship. The issue in this case as stated by the majority, i.e., whether the tenant under a lease of commercial property may defeat the landlord seeking possession at the end of the term by asserting a retaliatory defense, is too narrow. I perceive the issue to be: given the franchise-fiduciary relationship* between oil companies and their dealer-lessees, may the oil companies be permitted to rely upon their lease terms to coerce compliance with their illegal demands? That should not be permitted.

This case is distinguishable from *Division of Triple T Serv. (supra),* wherein the oil company indicated that it wanted to terminate the plaintiff's lease in order to convert the property into a diagnostic and repair service center. Here, there is no claim that the petitioner wants to alter or close its operation at the site. Moreover, there was no claim of duress in *Division of Triple T Serv.,* while here duress and coercion are at the very heart of the case. Accordingly, our holding in *Division of Triple T Serv.* offers little guidance here.

Before looking to the case law, which I conclude supports affirmance, the observation by the majority that any changes in the rights arising out of real property law are "customarily achieved by legislative or constitutional enactment" brings to mind that just a few weeks ago this court, in *Tonetti v Penati* (48 AD2d 25), held that a warranty of habitability should be implied in the rental of premises for use as a residence. In so doing, Mr. Justice SHAPIRO said (p 29): "It is evident that the rationale behind the common-law rule, which likened a lease to the sale of a chattel and therefore applied the ancient doctrine of *caveat emptor,* has no rational basis in a modern, urban society. Realistically viewed, and fiction discarded, a lease of residential premises establishes a contractual relationship with mutual obligations and is not intended to be treated as a conveyance of an interest in realty."

A similar realistic view should be taken of leases involving gasoline retail stations; ancient common-law precepts should be susceptible to change by an enlightened judiciary dealing with modern-day real property leases which are combined with dealership franchise agreements.

In my view, the case at bar comes within the holding of the Supreme Court of the United States in *Simpson v Union Oil Co.* (377 US 13). There, a gasoline service station lessee (on the

---

* So found by the trial court.

day before the expiration of his lease) brought an antitrust suit for damages and *to enjoin the lessor from taking possession of the property.* The lessee alleged that the lessor had refused to renew his lease because he sold the gasoline consigned to him by the lessor at a price below that fixed in the consignment agreement. The District Court for the Northern District of California, Southern Division granted the lessor summary judgment on the ground that there was no violation of the Sherman Act and that, even assuming such a violation, there was no showing by the lessee of actionable damage. The Court of Appeals for the Ninth Circuit affirmed on the ground the lessee had suffered no actionable wrong or damage (311 F2d 764). In reversing and remanding for a hearing on the issues, including damages, if any, the Supreme Court made the following comments (pp 16–18), which are appropriate at bar:

"We disagree with the Court of Appeals that there is no actionable wrong or damage if a Sherman Act violation is assumed. If the 'consignment' agreement achieves resale price maintenance in violation of the Sherman Act, *it and the lease are being used to injure* interstate commerce by depriving independent dealers of the exercise of free judgment whether to become consignees at all, or remain consignees, and, in any event, to sell at competitive prices. The fact that a retailer can refuse to deal does not give the supplier immunity if the arrangement is one of those schemes condemned by the antitrust laws. * * *

"The fact that, on failure to renew a lease, another dealer takes Simpson's place and renders the same service to the public is no more an answer here than it was in *Poller v Columbia Broadcasting System,* 368 US 464, 473. For Congress, not the oil distributor, is the arbiter of the public interest; and Congress has closely patrolled price fixing whether effected through resale price maintenance agreements or otherwise. The exclusive requirements contracts struck down in *Standard Oil Co. v United States,* 337 US 293, were not saved because dealers need not have agreed to them, but could have gone elsewhere. If that were a defense, a supplier could regiment thousands of otherwise competitive dealers in resale price maintenance programs merely by fear of nonrenewal of short-term leases.

"We made clear in *United States v Parke, Davis & Co.,* 362 US 29, that a supplier may not use coercion on its retail

outlets to achieve resale price maintenance. We reiterate that view, *adding that it matters not what the coercive device is.*
* * *

"Here we have an antitrust policy expressed in Acts of Congress. Accordingly, a consignment, *no matter how lawful it might be as a matter of private contract law,* must give way before the federal antitrust policy." (emphasis added throughout).

The point to emphasize is that a matter of private contract law, such as a lease, must give way when it is an instrument used to violate the Federal antitrust policy. In other words, cancellation of the lease and dealer arrangement under the circumstances here would be *unlawful,* even though in exercise of a right expressly granted by the lease *(Lessig v Tidewater. Oil Co.,* 327 F2d 459, 464).

In *Interphoto Corp. v Minolta Corp.* (295 F Supp 711, 723) the District Court for the Southern District of New York, stated this point as follows: "In addition to relying on the asserted absence of any nexus between the refusal to deal and the alleged conspiracies, Minolta claims its contractual right to terminate as a basis and justification for denying injunctive relief. This reliance on contract is misplaced. It is not open to doubt that, where a refusal to deal is in furtherance of an illegal conspiracy, the circumstance that the manufacturer or supplier has a contractual right to terminate the agreement is irrelevant. See, e.g., *Osborn v Sinclair Refining Company,* 324 F2d 566, 575 n 17 (4 Cir 1963); *Albrecht v Herald Co., supra; United States v Arnold, Schwinn & Co., supra.* This rule applies to defendants who have a right to cancel under a contract, see, e.g., *Osborn v Sinclair Refining Company, supra; McKesson and Robbins v Charles Pfizer & Co., Inc., supra;* to defendants who are simply choosing not to renew contracts, see, e.g., *Simpson v Union Oil Co.,* 377 US 13, 84 S Ct 1051 (1964); and even where there is in fact no contract but merely a history of dealing, see, e.g., *Beverage Distributors, Inc. v Olympia Brewing Co.,* 5 Trade Reg Rep (1968 Trade Cas) ¶ 72-530 (ND Cal Sept. 19, 1967), modified on other grounds, 395 F2d 850 (9 Cir May 17, 1968); *Kay Instrument Sales Co., Inc. v Haldex Aktiebolag, supra; Osborn v Sinclair Refining Company, supra* at fn 17. The Court may appropriately require that the defendant maintain plaintiff as a distributor pending the determination of a trial on the merits."

Although the *Osborn* case (324 F2d 566), cited in the above

quotation, involved a private antitrust action rather than an action to recover possession of property, the court noted, as I here contend, that it is no defense that the oil company has a contractual right, under the written lease and the written sales agreement, to terminate the relationship with the dealer *(supra,* p 575, n 17).

The majority says that while service station lessees have been permitted to recover damages for antitrust violations, the remedy of injunction to require the continuation of a service station lease has been withheld. The cases cited to support that conclusion are clearly distinguishable. In *Russell v Shell Oil Co.* (382 F Supp 395), there was no allegation whatsoever of antitrust violations, fraud or coercion. The plaintiff's claim was that the defendant's decision to terminate the lease and dealer agreement was arbitrary and not in accordance with normal business practice. Finding no support or basis for the plaintiff's position, the District Court (ED, Mich) held that the defendant was entitled to possession as the lease had expired. In *Hollander v American Oil Co.* (329 F Supp 1300), there were alleged violations of the Clayton Antitrust Act, but the allegations were not supported by evidence. In fact, in support of the oil company's decision not to renew the lease, there was evidence that the dealer had failed to keep his station clean and evidence of a decline in gasoline sales. In denying the dealer's request for a preliminary injunction, the District Court (WD, Pa) concluded that he had failed to establish the three requirements: (1) irreparable injury, (2) equities in his favor and (3) a reasonable likelihood of success on the merits.

In cases where these requirements have been shown, the courts have not hesitated to grant injunctive relief. In *Milsen Co. v Southland Corp.* (454 F2d 363, 366), the Court of Appeals for the Seventh Circuit stated as follows: "Many courts have held that defendants who are or may be guilty of anti-competitive practices should not be permitted to terminate franchises, leases or sales contracts when such terminations would effectuate those practices. *Semmes Motors, Inc. v Ford Motor Co.,* 429 F2d 1197 (2d Cir 1970); *Sahm v V-1 Oil Co.,* 402 F2d 69 (10th Cir 1968); *Broussard v Socony Mobil Oil Co.,* 350 F2d 346 (5th Cir 1965); *Bergen Drug Co. v Parke, Davis & Co.,* 307 F2d 725 (3d Cir 1962); *Bateman v Ford Motor Co.,* 302 F2d 63 (3d Cir 1962); *Interphoto Corp. v Minolta Corp.,* 295 F Supp 711 (SDNY) affd 417 F2d 621 (2d Cir 1969); *Wurzberg Brothers, Inc. v Head Ski Co.,* 276 F Supp 142 (DNJ 1967); *Madsen v*

*Chrysler Corp.,* 261 F Supp 488 (ND Ill 1966), vacated as moot, 375 F2d 773 (7th Cir 1967); *McKesson and Robbins, Inc. v Charles Pfizer & Co.,* 235 F Supp 743 (ED Pa 1964)."

It is obvious that the only effective means to prevent termination in a case such as this is an injunction, and not a suit for treble damages. As noted above, the *Simpson* case (377 US 13, *supra)* included a request for injunctive relief and the Supreme Court gave no indication that such relief could not be granted. The recovery of damages, long after the fact, is small consolation to a man such as the respondent Rubenfeld, who has put 17 years of his life into his career as a Mobil Oil dealer. He wants to continue in business, not subsist on an award of damages (see *Semmes Motors v Ford Motor Co.,* 429 F2d 1197, 1205). Nowhere is it claimed that Rubenfeld has not been an effective, profitable dealer. Indeed, his long standing relationship with Mobil indicates that the latter was pleased with his performance and ability. After all, it was Mobil which urged Rubenfeld that he could build a secure future for his family if he became one of its dealers. To hold that the courts are powerless to enjoin Mobil from terminating, under the circumstances of this case, seems to me to be a mockery of justice.

Where, as here, the court is satisfied that an illegal conspiracy exists, and that the refusal to continue the dealership is in furtherance of that conspiracy, the court should not permit the dealership to be terminated by the guilty party (see *Interphoto Corp. v Minolta Corp.,* 295 F Supp 711, 723, *supra; Semmes Motors v Ford Motor Co.,* 429 F2d 1197, 1205, *supra).* The inequities of such a situation "prove the wisdom of courts which have refused to permit a party to benefit from contractual rights when the contract is an instrument of restraint of trade" *(Milsen Co. v Southland Corp.,* 454 F2d 363, 368–369).

The order appealed from should be affirmed.

RABIN, Acting P. J., MARTUSCELLO and COHALAN, JJ., concur with HOPKINS, J.; MUNDER, J., dissents and votes to affirm the order of the Appellate Term, with an opinion.

Order of the Appellate Term of the Supreme Court for the Second and Eleventh Judicial Districts, dated January 4, 1974, and judgment of the Civil Court of the City of New York, Queens County entered December 19, 1972, reversed, on the law, without costs, and petition granted. The findings of fact of the Appellate Term and of the Civil Court are affirmed.