OREMAN SALES, INC.

v.

MATSUSHITA ELECTRIC CORPORATION OF AMERICA d/b/a Panasonic Industrial Company.

Civ. A. No. 90–4947.

United States District Court,
E.D. Louisiana.

June 6, 1991.

John Emmett, Emmett, Cobb, Waits & Kessnich, New Orleans, La., for plaintiff.

Perry Staub, Elise Brown, Monroe & Lemann, New Orleans, La., for defendant.

## ORDER AND REASONS

PATRICK E. CARR, District Judge.

This civil action is before the Court on the defendant's motion to dismiss [Record Document No. 5]. By Minute Entry of May 14, 1991, the Court took the motion under submission without oral argument. The Court now GRANTS the motion.

A local computer printer distributor, Oreman Sales, Inc. (Oreman), is suing one of its former suppliers, Matsushita Electric Corporation of America d/b/a Panasonic Industrial Company (Panasonic), for wrongfully terminating their distribution agreement, for interfering with Oreman's business with others, and for price discrimination among distributors. Oreman's com-

plaint lacks certain necessary factual allegations on the one hand and relies on certain erroneous legal conclusions on the other. Together, these defects prove fatal to the viability of Oreman's complaint.

I. *Background and allegations*

Oreman is a local wholesale distributor of electronic equipment, including computer printers. Panasonic is the manufacturer (or U.S. affiliate distributor of a foreign manufacturer) of electronic equipment, including computer printers. Complete diversity exists between the two parties.

Oreman alleges that beginning in 1985, it and Panasonic made a series of agreements whereby Oreman would act as a distributor for certain Panasonic products. The last of the series was entered effective May 31, 1989; a copy of this written agreement is attached to Panasonic's motion to dismiss. Generally, the agreement makes Oreman a non-exclusive wholesale distributor for certain enumerated Panasonic computer printers in a territory covering Louisiana and six surrounding states (Texas, Oklahoma, Arkansas, Mississippi, Alabama, and Tennessee).

In section 2 of the agreement, Panasonic specifically reserved the right to have itself and others compete directly with Oreman:

... Notwithstanding anything to the contrary herein, PIC [Panasonic] reserves the unrestricted right to solicit and make direct sales of the Products to anyone, anywhere, and to appoint additional distributors of the Products and/or dealers, sales agents or sales representatives for the Products in the Territory and elsewhere, as in PIC's best judgment may from time to time be desirable, without obligation to DISTRIBUTOR [Oreman] of any kind, including, without limitation, for any commissions or other charges upon or in respect of any such sale or sales.

In section 3, Oreman agreed "not to resell the Products to customer locations outside of the [seven-state] Territory or to end-users, except upon the prior written consent of" Panasonic. Section 12 imposes certain record-keeping obligations on Oreman for its activities under the agreement:

12.1 DISTRIBUTOR shall at all time keep and maintain at its place of business herein set forth accurate books, records, correspondence and data of all transactions pertaining to this Agreement, and shall at all time make available and permit PIC or its authorized representative to examine or take extracts or copies of the same during normal business hours. All such books, records, correspondence and data shall be retained by DISTRIBUTOR during the term of this Agreement and for a period of one (1) year after the date of termination or expiration of this Agreement, except as otherwise provided in Paragraph 12.2, and thereafter PIC's rights with respect to the same shall cease.

12.2 DISTRIBUTOR shall at all times make available to PIC such of its records as are necessary for PIC to fulfill any recall or other obligations PIC deems necessary under Federal, state or local statutes, laws, rules or regulations, and such obligations shall survive and continue indefinitely after termination or expiration of this Agreement.

12.3 DISTRIBUTOR will promptly prepare and forward, as required by PIC, any and all reports PIC deems necessary for the carrying on of the mutual business of DISTRIBUTOR and PIC.

Section 14 emphasizes the independent buyer/seller relationship between Oreman and Panasonic:

14.1 Except as otherwise provided in Paragraph 13.3 above [providing Panasonic a standard UCC Article 9 security interest in the goods it sells to Oreman], the relationship between PIC and DISTRIBUTOR is intended to, and shall, be that of buyer and seller and DISTRIBUTOR and its employees, agents and representatives shall under no circumstances be considered employees, agents, partners, joint venturers or representatives of PIC....

14.2 The relationship created by this Agreement is not intended by the parties to constitute the granting of a franchise to DISTRIBUTOR by PIC, and no Federal or state franchise statute, law, regula-

tion or rule is intended by the parties to apply such relationship; nor shall any such franchise statute, law, regulation or rule be deemed or construed to apply to the formation, operation, administration or termination of this Agreement.

Section 16 effectively provides that the agreement is an "at will" agreement between the parties:

16.1 This Agreement shall be deemed effective upon the date of execution by a duly authorized representative of PIC and shall continue until December 31 of the current year. Thereafter, this Agreement shall renew automatically for successive one-year additional terms unless either party elects, by written notice to the other no less than thirty (30) days prior to the expiration date of the then current term, to permit this Agreement to expire. Anything to the contrary notwithstanding, either PIC or DISTRIBUTOR may terminate this Agreement, and the appointment of DISTRIBUTOR as a Regional Authorized Distributor of the Products, with or without cause, at any time upon written notice to the other to that effect, and said termination shall become effective thirty (30) days following the mailing of such notice, except where a shorter period for termination is provided in this Agreement.

. . . .

16.4 The expiration or termination of this Agreement at any time shall, unless otherwise expressly agreed to in writing by PIC, automatically operate, as of the effective date thereof, as a cancellation of any further deliveries of Products to DISTRIBUTOR, and shall be construed as an automatic cancellation of all purchase orders and releases of DISTRIBUTOR for Products, whether or not any such orders have theretofore been accepted by PIC.

. . . .

16.8 Neither PIC nor DISTRIBUTOR shall be liable to the other, or to any other party, by virtue of the expiration or termination of this Agreement due to any reason whatsoever, or due to no reason, or by virtue of the cancellation, pursuant to Paragraph 16.4 above, of any orders of Products that are undelivered on the effective date of any expiration or termination of this Agreement, including, without limitation, any liability for direct, indirect, special, consequential or incidental damages sustained by reason of such expiration or termination, including, without limitation, any claim for loss of profits or prospective profits in respect of sales or anticipated sales of Products, or on account of any expenditures, investments, leases, capital improvements or any other commitments made by either of the parties in connection with their respective businesses made in reliance upon or by virtue of DISTRIBUTOR's appointment as a Regional Authorized Distributor of the Products or otherwise; nor shall PIC or DISTRIBUTOR have the right to any equitable remedies by reason of the expiration or termination of this Agreement.

Section 25 provides for New York law to govern the agreement and the performance under the agreement.

Oreman alleges that its "volume of business" with Panasonic "was projected to exceed" $6 million per year by 1990. Oreman alleges that Panasonic "unilaterally terminated the agreement between the parties without cause" in April 1990. Oreman does not allege, however, that Panasonic failed to observe the 30–day delay period set forth in paragraph 16.1 of the agreement.

In an apparent effort to assert that Panasonic owed it an "implied fiduciary duty in tort under the provisions of New York law," Oreman alleges:

During the course of their dealings, a confidential relationship arose by virtue of Panasonic's dominance as a manufacturer over its distributor, in which [Oreman] provided sensitive business and trade information to Panasonic, including, but not limited to, sales volumes, financial statements, and the identity of [Oreman]'s customers for Panasonic's goods. [Oreman] invested substantial

time, money, and effort in promoting [Panasonic]'s products and even expended its business into other states in order to discharge its responsibilities as a Panasonic distributor.

Oreman suggests the source of this "confidential relationship composing a fiduciary duty" as being "[t]he contract between plaintiff and defendant." Oreman further suggests that the termination provisions in section 16 of the agreement are unenforceable:

> Oreman specifically pleads that the termination provisions of the contract that Panasonic relied upon in terminating the regional distribution agreement was [sic] unconscionable under Article 2–302 of the Uniform Commercial Code. Oreman specifically alleges that in order to distribute Panasonic products it had no meaningful choice but to agree [to] the provisions allowing Panasonic to terminate the agreement without cause. Oreman further alleges that the contract terms are unreasonably favorable to Panasonic and that they allow Oreman Sales to be terminated as a distributor at virtually any time notwithstanding the substantial investment of time and money by Oreman in order to promote Panasonic products.

Thus, Oreman asserts that Panasonic's termination of the agreement was wrongful and in bad faith.

Oreman further seeks to assert a claim under New York law for "tortiously interfer[ing] with [Oreman]'s business":

> Upon information and belief, both prior to and following Oremans [sic] termination as a Panasonic distributor, representatives of Panasonic approached two of Oreman's customers in the Dallas, Texas area. Oreman specifically alleges that its customers, Soft Warehouse and Seabrook were approached by representatives of Panasonic prior to and after Oreman's termination with a request that they purchase their Panasonic computer products directly from Panasonic. In making these overtures, Panasonic used the good will and confidential sales information developed by Oreman in its relationship with these two customers. Oreman further alleges that even prior to Oreman's termination as a regional distributor that Panasonic employees encouraged Soft Warehouse and Seabrook to purchase their goods from a different Panasonic distributor who directly competed with Oreman, Hallmark Electronics Corporation. As a result of Panasonic's attempts to have these customers purchase goods from a different distributor, Oreman claims that it has lost revenue in forms of sales that were made to these customers by Hallmark rather than by Oreman.

> Oreman further alleges tortious conduct on the part of Panasonic deliberately establishing and continuing its distributor relationship with Oreman Sales with the intent of later terminating Oreman and doing business directly with Oreman's customers after Oreman had developed and nurtured a market for Panasonic's products. Upon information and belief, Panasonic executives at some point in 1988 made a decision to eliminate or substantially curtail the national distribution network of Office Automation Group products with the intention of selling directly to the customers of the distributors. A meeting was held at some point in 1988 at the La Costa Country Club in California for the specific purpose of implementing that plan. At that meeting, each regional manager of Panasonic was instructed to select two regional distributors who would be terminated. Oreman Sales was selected at that time. Despite its 1988 decision to terminate Oreman Sales, Panasonic continued in its contractual relationship with Oreman until April, 1990 with the sole and specific purpose of later appropriating Oreman's customers after Oreman had continued to cultivate a market for Panasonic products. . . .

Finally, Oreman attempts to assert a violation of section 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a):

> From information received from a former employee of Panasonic, Oreman alleges that Panasonic routinely discriminated in price in the major product lines

purchased by Oreman Sales, Inc. including the printers bearing the designation P1124, P4450, P1180 and P1191. Discrimination was accomplished through the issuance of meet competition price reductions to various favored distributors. Based upon the information supplied by this individual, Oreman alleges that distributors D & H and J.H. Lawrence were given these discounts. As related by the individual, the purpose of these reductions was not in fact to meet competition, but rather to give lower prices to favorite distributors.

Based upon documents supplied by Panasonic, J.H. Lawrence in November, 1989, was given $45,000 by Panasonic for a promotion of KXP4450 printers. Likewise, National Computer Distributors of Miami, Florida was given in October, 1989 a reduction of $55,000 in the cost of 1,100 P4450 printers. In March, 1989, Gates Distributing was given a reduction of $100 for each P4450 printer purchased over and above that given to Oreman Sales, Inc. In February, 1989, Hallmark Electronics, which directly competed against Oreman Sales in the Dallas market, was given $60,000 in funds not made available to Oreman for the marketing of P44–50 and P11–80 printers. Despite numerous requests, similar market development funds and price reductions were not made available to Oreman Sales, Inc. During this time period in 1989, each of these distributors as well as Oreman Sales purchased hundreds if not thousands of these items in interstate commerce. The effect of these price reductions was to substantially lessen competition among distributors of Panasonic products.

The reduced price given to these favored distributors had the effect of substantially lessening the ability of Oreman Sales to compete with the favored distributors. Oreman lost sales as a result of the favored prices given to other distributors, and has therefore sustained injury.

Oreman does not otherwise allege that any of these five other distributors other than Hall–Mark Electronics of Dallas did business in any of the seven states in which Oreman was authorized to sell Panasonic products.[1]

## II. *Discussion*

Although Panasonic has styled its entire motion as one to dismiss under Rule 12(b)(6), it has attached a copy of the parties' written agreement in support of its argument that Oreman's state law claims (i.e., all claims other than the federal price discrimination claim) cannot succeed.[2] Oreman does not object to Panasonic's relying in part on documents beyond the pleadings (Oreman did not attach a copy of the agreement to its complaint) or suggest that the parties had ever modified, or agreed to terms different from or additional to, the terms in the document Panasonic has attached; instead, Oreman first requested a continuance to conduct certain discovery and thereafter submitted further documents beyond the pleadings in an apparent effort to show a genuine dispute of material fact on these state law claims. Thus, like both parties, the Court treats Panasonic's motion to dismiss the state law claims as one under Rule 56(b) for summary judgment based solely on the terms of the parties' written agreement.[3]

Because Panasonic's arguments for dismissing the federal price discrimination

---

1. Exhibits submitted by Oreman give addresses outside this seven-state area for three of these distributors: Exh. F lists California for Gates, Exh. G list Florida for National Computer, and Exh. H lists Massachusetts for J.H. Lawrence.

2. *Cf.* 5A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1364, at 475–78 & n. 29 (2d ed. 1990) (citing, among other cases, *General Guaranty Insurance Co. v. Parkerson,* 369 F.2d 821, 823 (5th Cir.1966)) (often appropriate to consider the terms of the parties' contract for determining whether a plaintiff's claims related to that contract are sufficient).

3. Oreman can claim no surprise in the Court's converting this portion of the motion to a Rule 56(b) motion on this narrow basis. *See In re G. & A. Books, Inc.,* 770 F.2d 288, 295 (2d Cir.1985), *cert. denied sub nom. M.J.M. Exhibitors, Inc. v. Stern,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986). Further, by its minute entry of May 9, 1991, the Court effectively advised that it would be considering matters beyond the pleadings. *Cf.* WRIGHT & MILLER, § 1366, at 506 & n. 26 ("there is authority for the notion that the absence of formal notice will be excused when it is harmless or the parties were otherwise

claim do not refer to any matters beyond Oreman's complaint as amended, the Court does not treat Panasonic's motion on this one claim as being one under Rule 56(b), but instead as being one solely under Rule 12(b)(6).

■ Oreman asserts that Panasonic's motion should be postponed until after Panasonic has submitted to a Rule 30(b)(6) deposition. The Court disagrees. On the one hand, Oreman has not shown reasonable diligence in scheduling such a deposition: notwithstanding that over four months have passed since Panasonic filed its motion and that over five months have passed since Panasonic was served, the record contains no notice that Oreman has ever set *any* deposition. Further, Oreman has neither formally moved for a further continuance beyond three already granted nor filed a Rule 56(f) affidavit.[4] On the other hand, Oreman has shown no *valid* basis for needing more discovery before it can properly oppose Panasonic's motion: Panasonic is seeking dismissal not on any factual, evidentiary ground but solely on legal grounds based, for the state law claims, on the terms of an undisputed written contract and based, for the federal price discrimination claim, on the sufficiency of the factual allegations in the complaint. Under the amended federal rules, a plaintiff may no longer file a conclusory complaint not well-grounded in fact, conduct a fishing expedition for discovery, and only then amend its complaint in order finally to set forth well-pleaded allegations.

## A. Termination of distribution agreement

Oreman asserts that Panasonic wrongfully terminated the parties' distribution agreement. In an attempt to circumvent the express language in paragraph 16.1 authorizing either party to terminate the agreement, upon 30 days' notice, at any time *with or without cause,* Oreman asserts that Panasonic was acting in bad faith when it terminated the agreement, that Panasonic was a fiduciary, and that this provision is "unconscionable" under the UCC.

Section 25 of the distribution agreement provides for New York law to govern its performance. New York law generally upholds contractual clauses that permit either party to cancel the contract with or without cause upon notice.[5]

■ Where a sales distribution contract contains such a clause, New York law,

apprised of the conversion") (citing, among other cases, *Clark v. Tarrant County, Texas,* 798 F.2d 736, 745–46, *reh'g en banc denied mem.,* 802 F.2d 455 (5th Cir.1986)).

**4.** *See Walls v. General Motors, Inc.,* 906 F.2d 143, 146–47 (5th Cir.1990); *SEC v. Spence & Green Chemical Co.,* 612 F.2d 896, 900–01 (5th Cir.1980), *cert. denied,* 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981).

**5.** *See A.S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 382, 165 N.Y.S.2d 475, 486, 144 N.E.2d 371, 379 (1957) (for a distribution contract providing "that either party might terminate it 'at any time' "); *Foley Productions, Inc. v. Singer Corp.,* 133 A.D.2d 531, 531, 519 N.Y.S.2d 902, 903 (4th Dep't 1987) (written distributorship agreement providing for termination upon "a 90 day written advance notice"); *Pharmaceutical Horizons, Inc. v. Sterling Drug, Inc.,* 127 A.D.2d 514, 514, 512 N.Y.S.2d 30, 31 (1st Dep't 1987) (exclusive drug licensing agreement giving the manufacturer "the right to terminate the agreement at any time before it accrued royalties"), *appeal dismissed,* 69 N.Y.2d 984, 516 N.Y.S.2d 1027, 509 N.E.2d 3622 (1987); *Brown v. Retsof Mining Co.,* 127 A.D. 368, 371, 111 N.Y.S. 594, 597 (2d Dep't 1908) (exclusive sales agent contract for "as long as [the sales agent] conduct[s] the business in a manner satisfactory to [the manufacturer]"); *Szatmari v. Rosenbaum,* 128 Misc.2d 232, 233, 490 N.Y.S.2d 97, 99 (Just.Ct.1985) (contract for child care services "giv[ing] 4 weeks notice before terminating child care"); *Cycleway, Inc. v. Kawasaki Motors Corp., U.S.A.,* 77 Misc.2d 829, 832, 354 N.Y.S.2d 812, 816 (Sup.Ct.1974) (motorcycle distributorship agreement giving both parties "the right to terminate the contract on 30 days' written notice to the other with or without cause"); *Mobil Oil Corp. v. Lione,* 66 Misc.2d 599, 603, 322 N.Y.S.2d 82, 86 (Dist.Ct.1971) (year-to-year property lease providing that "it shall terminate at the end of the current period (original or renewal) by notice from either party to the other given not less than 90 days prior to such termination"); *Division of Triple T Service, Inc. v. Mobil Oil Corp.,* 60 Misc.2d 720, 726, 304 N.Y.S.2d 191, 198 (Sup.Ct.1969) (upholding franchisor's right to terminate agreement without cause upon notice), *aff'd mem.,* 34 A.D.2d 618, 311 N.Y.S.2d 961 (2d Dep't 1970); *Sinkoff Beverage Co. v. Jos. Schlitz Brewing Co.,* 51 Misc.2d 446, 447, 273 N.Y.S.2d 364, 366 (Sup.Ct. 1966) (beer distributorship agreement providing "that it might be terminated at any time without

whether under the UCC or otherwise, imposes no basis to presume bad faith from a termination without good cause and thus does not render the termination wrongful.[6] In such cases, "the power to terminate [is] unqualified and not even good faith [is] required."[7] "Where a contract gives either party thereto the absolute unqualified right to terminate upon notice, the court need not look to the reason behind the notice to terminate"[8] and the clause "must be enforced as written."[9]

 In an effort to avoid this clause, Oreman asserts that Panasonic owed it a fiduciary duty under New York law and breached that duty. The assertion is misplaced, whether New York or Louisiana law applies for determining whether a fiduciary relationship exists notwithstanding the language in section 14 of the distribution agreement. On the one hand, even if a fiduciary duty exists under New York law (an issue on which the Court need not and does not express any opinion), no breach of that duty could occur merely from Panasonic's exercising the termination or other rights specifically permitted in the governing contract.[10] On the other, Louisiana law imposes no fiduciary duty where as here a

---

cause or notice by either party"); *Noah v. L. Daitch & Co.,* 22 Misc.2d 649, 652, 192 N.Y.S.2d 380, 385 (Sup.Ct.1959) (upholding termination after 43 days' notice, whether the milk distribution agreement contained no termination clause or instead a clause giving the producer the right to terminate at any time after one year on 30 days' written notice).

Louisiana law holds the same. *See Dorsey v. State Farm Insurance Co.,* 294 F.2d 678, 680 (5th Cir.1961) (citing *Martin–Parry Corp. v. New Orleans Fire Detection Service,* 221 La. 677, 685, 60 So.2d 83, 86 (1952)); *Inabnet v. Pan American Life Insurance Co.,* 267 So.2d 774, 776–77 (La. App. 2d Cir.), *writ denied,* 263 La. 613, 268 So.2d 675 (1972).

**6.** Compare *Triple T,* 60 Misc.2d at 729, 304 N.Y.S.2d at 201 (UCC) *with id.* at 727, 304 N.Y.S.2d at 199 (otherwise). *See generally Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129, 135–139 (5th Cir.) (Wisdom, J.) (adopting "the better view" for Iowa law), *reh'g en banc denied mem.,* 597 F.2d 772 (5th Cir.), *cert. denied,* 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979).

Citing a footnote in *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 923 n. 8 (2d Cir.1977), Oreman asserts the general proposition that "[u]nder New York law there is implied in every contract a covenant of fair dealing and good faith." The Court does not dispute the proposition. Unlike in *Contemporary Mission,* which did not concern or discuss termination clauses, the issue here is the wholly distinct issue what, if anything, may constitute a breach of that covenant *in the context of an at-will termination clause.*

**7.** *Rubinger v. International Telephone & Telegraph Corp.,* 193 F.Supp. 711, 718 (S.D.N.Y.1961) (applying New York law), *aff'd,* 310 F.2d 552 (2d Cir.1962), *cert. denied,* 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963); *cf. Mobil Oil Corp. v. Rubenfeld,* 48 A.D.2d 428, 431, 370 N.Y.S.2d 943, 947 (2d Dep't 1975) (a duty of good faith in terminating a contract with an "at will" termination clause exists only where a statute imposes that specific duty notwithstanding the clause), *aff'd mem.,* 40 N.Y.S.2d 936, 390 N.Y.S.2d 57, 358 N.E.2d 882 (1976).

**8.** *Lione,* 66 Misc.2d at 603, 322 N.Y.S.2d at 86; *Triple T,* 60 Misc.2d at 726, 304 N.Y.S.2d at 198.

**9.** *Rampell,* 3 N.Y.2d at 382, 165 N.Y.S.2d at 486, 144 N.E.2d at 379; *Szatmari,* 128 Misc.2d at 233, 490 N.Y.S.2d at 99; *Cycleway,* 77 Misc.2d at 832, 354 N.Y.S.2d at 816; *Noah,* 22 Misc.2d at 652, 192 N.Y.S.2d at 385.

**10.** *See Rampell,* 3 N.Y.2d at 382, 165 N.Y.S.2d at 486, 144 N.E.2d at 379; *see also Carter Equipment Co. v. John Deere Industrial Equipment Co.,* 681 F.2d 386, 392 n. 14 (5th Cir.1982) (following *Corenswet* for Mississippi law); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 485 (5th Cir.1984) (following *Corenswet* for Louisiana law) ("The implied obligation to execute a contract in good faith usually modifies the express terms of the contract and should not be used to override or contradict them.").

In *Rubenfeld,* the Appellate Division distinguished a case cited by Oreman, *Shell Oil Co. v. Marinello,* 120 N.J.Super. 357, 294 A.2d 253 (1972), *modified,* 63 N.J. 402, 307 A.2d 598 (1973) (applying New Jersey law), *cert. denied,* 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974), on the ground that New Jersey, unlike New York, had enacted a statute "expressly prohibiting a franchisor from failing to renew a franchise without cause." *Rubenfeld,* 48 A.D.2d at 433–34, 370 N.Y.S.2d at 949. While New York soon thereafter enacted a similar law for motor fuel franchises, *see* 1975 N.Y.Laws 265 (codified as amended in N.Y.GEN.BUS. art. 11–B), this rationale of *Rubenfeld* still applies to other types of franchise or distributorship agreements.

Citing *Murphy v. Gutfreund,* 583 F.Supp. 957, 971 (S.D.N.Y.1984) and *Rockwood Computer*

buyer's relationship to a seller is merely contractual.[11]

▮ In an alternative effort to avoid the termination clause, Oreman asserts that it is "unconscionable." To prevail on a theory of unconscionability, Oreman "would have to demonstrate (1) that it had no 'meaningful choice' but to deal with [Panasonic] and accept the contract as offered, and (2) that the termination clause was 'unreasonably favorable' to [Panasonic]."[12] The time frame for this inquiry is the time the contract was made.[13] "[I]t is the exceptional commercial setting where a claim of unconscionability will be allowed."[14] As a matter of law,[15] Oreman cannot show such exceptional circumstances.

On the one hand, Oreman does not allege, and with the host of computer printer manufacturers the Court cannot reasonably infer, that Oreman had no meaningful choice but to deal with just Panasonic in order to handle *any* computer printers. New York law is well-settled that one party's superior bargaining power is not enough to "constitute unlawful coercion or duress"[16] or for finding a sales contract unconscionable.[17] On the other hand, affording the same rights of termination to either side, the clause does not favor either side; while the termination here may have *adversely* affected Oreman more than Panasonic, it does not follow—especially when viewed from the time the agreement was made—that the *clause* itself thus *favors* Panasonic. As the numerous cases, including those cited above, upholding substantively identical termination clauses show, the clause is not "so one-sided as to be unreasonable."[18] In sum, no jury could find the clause unconscionable.[19]

In short, as paragraph 16.8 of the distribution agreement confirms, Panasonic cannot be held liable here to Oreman for terminating the agreement.

## B. Tortious interference with contractual relations

▮ Oreman next asserts that Panasonic tortiously interfered with its business

---

*Corp. v. Morris,* 94 F.R.D. 64, 68–69 (E.D.N.Y.1982), Oreman asserts that "New York law does not sanction the use of a release in order to avoid a breach of fiduciary causes of action." The correctness of that proposition is, however, a separate question not before the Court. Even assuming a fiduciary duty exists, the issue here is not whether some term of the distribution agreement purports to release Panasonic from liability for some prior breach, but instead whether Panasonic's terminating this particular agreement without cause could itself legally constitute a breach.

**11.** *Tahoe Corp. v. P & G Gathering Systems, Inc.,* 506 So.2d 1336, 1345 (La.App. 2d Cir.1987); *see also Safford v. PaineWebber, Inc.,* 730 F.Supp. 15, 18 (E.D.La.1990) (quoting *State v. Hagerty,* 251 La. 477, 492–93, 205 So.2d 369, 374–75 (1967), *cert. denied,* 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 855 (1968)).

**12.** *Corenswet,* 594 F.2d at 139 n. 12; *see Leasing Service Corp. v. Broetje,* 545 F.Supp. 362, 366 (S.D.N.Y.1982) (applying New York law).

**13.** *See Lione,* 66 Misc.2d at 603, 322 N.Y.S.2d at 87; *Triple T,* 60 Misc.2d at 730, 304 N.Y.S.2d at 201; *Sinkoff,* 51 Misc.2d at 448, 273 N.Y.S.2d at 367.

**14.** *Leasing Service Corp. v. Graham,* 646 F.Supp. 1410, 1418 (S.D.N.Y.1986) (applying Texas law) (quoting *County Asphalt, Inc. v. Lewis Welding & Engineering Corp.,* 323 F.Supp. 1300, 1308 (S.D.N.Y.1970), *aff'd,* 444 F.2d 372 (2d Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971)).

**15.** *See Carvel Corp. v. Eisenberg,* 692 F.Supp. 182, 185 (S.D.N.Y.1988) (the "question of unconscionability is a matter of law" under New York law); *cf. Triple T,* 60 Misc.2d at 729–30, 304 N.Y.S.2d at 201–02 (granting motion to dismiss for failure to state a claim).

**16.** *Polygram, S.A. v. 32–03 Enterprises, Inc.,* 697 F.Supp. 132, 137 (E.D.N.Y.1988).

**17.** *Rubin v. Telemet America, Inc.,* 698 F.Supp. 447, 450 (S.D.N.Y.1988) (citing *Burnell v. Morning Star Homes Inc.,* 114 A.D.2d 657, 658, 494 N.Y.S.2d 488, 490 (3d Dep't 1985)); *see Triple T,* 60 Misc.2d at 730, 304 N.Y.S.2d at 202.

**18.** *Graham,* 646 F.Supp. at 1418; *see Rubin,* 698 F.Supp. at 450 (quoting *State v. Avco Financial Service of New York,* 50 N.Y.2d 383, 390, 429 N.Y.S.2d 181, 185, 406 N.E.2d 1075, 1078 (1980)); *Triple T,* 60 Misc.2d at 730, 304 N.Y.S.2d at 201 ("so one-sided as to oppress or unfairly surprise one party").

**19.** *See Triple T,* 60 Misc.2d at 729–30, 304 N.Y.S.2d at 201–02 (granting motion to dismiss for failure to state a claim); *see also Lione,* 66 Misc.2d at 603, 322 N.Y.S.2d at 86–87 (after trial); *Sinkoff,* 51 Misc.2d at 447–48, 273

relations with at least two of its customers. Pointing to the distribution agreement's provision for New York law, Oreman asserts that New York law applies to this claim as well. Noting that this claim is a tort claim and not a contract claim, Panasonic asserts that Louisiana law applies. The Court need not resolve this choice-of-law issue: the result is the same under either state's law.

Asserting no alternative arguments under Louisiana law, Oreman apparently concedes that Louisiana law would give it no remedy. The Court agrees. In *9 to 5 Fashions, Inc. v. Spurney*,[20] the Louisiana Supreme Court recognized a duty on the part of a corporate officer not to interfere intentionally with his corporation's contractual relations. Heeding *9 to 5*'s refusal "to adopt whole and undigested the fully expanded common law doctrine of interference with contract,"[21] Louisiana courts have not expanded this duty in *9 to 5* beyond its peculiar facts.[22] *Erie*-bound, this Court is not free to expand this duty either.[23]

To succeed on this claim under New York law, Oreman must establish the following elements among others: (1) the existence of a valid contract between Oreman and a third party; (2) Panasonic's knowledge of that contract; (3) Panasonic's intentional procurement of a breach of that contract by the third party; and (4) damages to Oreman from the breach.[24] "If the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct."[25] "[T]he 'wrongful means' that a party may not employ to compete for business are 'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract.' "[26]

Oreman cannot satisfy any of the four elements. First, while Oreman's complaint infers that Panasonic knew that Soft Warehouse and Seabrook were Oreman's "customers," Oreman does not allege that it had a "valid contract" (as opposed to some vague business acquaintance or "relationship") with either of those two companies. Second, perforce, Oreman does not allege that Panasonic "knew" of any *contracts* between Oreman and these two companies. Third, by alleging that Panasonic urged these two to "purchase their Panasonic computer products directly from Panasonic," Oreman's complaint specifically acknowledges that any such conduct was "at least in part, to advance [Panasonic's] own

N.Y.S.2d at 366–67 (denying preliminary injunction).

20. 538 So.2d 228 (La.1989).

21. *Id.* at 234.

22. *See Great Southwest Fire Insurance Co. v. CNA Insurance Companies*, 557 So.2d 966, 969 (La.1990); *Butler v. Reeder*, 573 So.2d 1159, 1160 (La.App. 5th Cir.1991); *Frisard v. Eastover Bank for Savings*, 572 So.2d 343, 347 (La.App. 5th Cir.1990); *Spencer–Wallington, Inc. v. Service Merchandise, Inc.*, 562 So.2d 1060, 1063–64 (La.App. 1st Cir.), *writ denied*, 567 So.2d 109 (La.1990); *Tallo v. Stroh Brewery Co.*, 544 So.2d 452, 453 (La.App. 4th Cir.), *writ denied*, 547 So.2d 355 (La.1989); *Farrell v. Boyer*, 541 So.2d 398, 400 (La.App. 4th Cir.1989).

23. *Compare Thompson v. Johns–Manville Sales Corp.*, 714 F.2d 581, 583 (5th Cir.1983) ("departures [from earlier state law] are for the Louisiana courts, not for us"), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984) *with Tallo*, 544 So.2d at 455 (Schott, C.J., concurring) (any expansion of the duty in *9 to 5* should be solely by the Louisiana Supreme Court).

24. *Sharma v. Skaarup Ship Management Corp.*, 699 F.Supp. 440, 446 (S.D.N.Y.1988), *reh'g denied*, 723 F.Supp. 200 (S.D.N.Y.1989), *aff'd*, 916 F.2d 820, 828 (2d Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 1109, 113 L.Ed.2d 218 (1991); *Nordic Bank PLC v. Trend Group, Ltd.*, 619 F.Supp. 542, 560–61 (S.D.N.Y.1985); *Conniff v. Dodd, Mead & Co.*, 593 F.Supp. 266, 269 (S.D.N.Y.1984).

25. *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 269 (2d Cir.1987) (applying New York law); *see Noah*, 22 Misc.2d at 653, 192 N.Y.S.2d at 386.

26. *Paper Corp. of United States v. Schoeller Technical Papers, Inc.*, 724 F.Supp. 110, 120 (S.D.N.Y.1989) (quoting *Guard–Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 632, 406 N.E.2d 445, 449 (1980)).

competing interests." Section 2 of the distribution agreement verifies this position. Yet Oreman alleges nothing beyond "encourage[ment]" by Panasonic and does not allege that Panasonic used criminal or fraudulent conduct in this alleged encouragement to these two companies. Further, Oreman does not allege that either of these two companies breached any existing contract it had with Oreman.[27] Fourth, in section 2 of the distribution agreement, Oreman specifically agreed that both Panasonic and other Panasonic distributors could compete directly with Oreman; thus, Oreman cannot claim any damages from Panasonic's exercise of its rights under this provision. While an exclusive distributor might have a cause of action against a manufacturer for seeking to turn over the distributorship to another person,[28] the cause of action cannot succeed here where the parties specifically provided for Panasonic and others to compete with Oreman.[29]

### C. The price discrimination claim

Oreman contends that Panasonic has violated section 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a), which generally makes it unlawful for a seller to discriminate in prices for goods of like grade and quality if the effect of such price discrimination may be substantially to lessen competition in a line of interstate commerce,

unless the discrimination is justified. The statute expressly adds that "nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade."

■ A complaint asserting an antitrust violation must allege *facts* that if proven would establish each element of the claim. Even with the relaxed notice-pleading requirement under the federal rules, courts with antitrust complaints "do not accept as true conclusionary [sic] allegations in the complaint."[30] A conclusory statement without a supporting factual allegation in the complaint cannot withstand a motion to dismiss.[31]

■ For a section 13(a) claim to survive dismissal, both parties agree, a plaintiff's complaint must allege at least the following facts: (1) the same seller made two or more contemporaneous sales (2) of commodities of similar grade and quality (3) at different prices; (4) at least one of the sales was in interstate commerce; and (5) the price discrimination injured the plaintiff and (6) tended to lessen competition of the commodity line (7) substantially.[32]

■ *Oreman's complaint as amended fails on the last two points.*[33] Specifical-

**27.** *See Sharma,* 699 F.Supp. at 447 (citing *Jack L. Inselman & Co. v. FNB Financial Co.,* 41 N.Y.2d 1078, 1080, 396 N.Y.S.2d 347, 349, 364 N.E.2d 1119, 1120 (1977)).

**28.** *See Northshore Bottling v. C. Schmidt & Sons,* 22 N.Y.2d 171, 180, 292 N.Y.S.2d 86, 92–93, 239 N.E.2d 189, 193–94 (1968).

**29.** *See Manchester Equipment Co. v. Panasonic Industrial Co.,* 141 A.D.2d 616, 529 N.Y.S.2d 532 (2d Dep't) (directing, on the basis of a provision identical to section 2 of the distribution agreement here, dismissal of a distributor's complaint that Panasonic wrongfully sold its products directly to the distributor's established customers), *appeal dismissed,* 72 N.Y.2d 954, 534 N.Y.S.2d 667, 531 N.E.2d 299 (1988) *and appeal denied,* 73 N.Y.2d 703, 537 N.Y.S.2d 491, 534 N.E.2d 329 (1988); *cf. Domed Stadium,* 732 F.2d at 484 (where a franchise agreement governed by Louisiana law expressly provides that it grants a non-exclusive license and that the franchisor may operate other hotels anywhere else, the franchisor does not breach the agreement by

operating a hotel that directly competes with the franchisee's business).

**30.** *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.), *reh'g en banc denied mem.,* 683 F.2d 1373 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *see Lombard's, Inc. v. Prince Manufacturing, Inc.,* 753 F.2d 974, 975 (11th Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 851, 88 L.Ed.2d 892 (1986).

**31.** *See Lombard's,* 753 F.2d at 975; *Heart Disease Research Foundation v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972).

**32.** *See Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668, 677 (9th Cir.1975).

**33.** Panasonic suggests that the complaint also fails to make sufficient factual allegations that Panasonic made contemporaneous sales to Oreman and others *at different prices. Cf. L & L Oil Co. v. Murphy Oil Corp.,* 674 F.2d 1113, 1120 (5th Cir.1982) (must allege sales "to different

ly, it fails to make factual allegations that any price discrimination by Panasonic lessened competition in "any line of commerce," substantially or otherwise. First, the statutory focus is not to be—as Oreman would have it—on the sales of just four models of Panasonic printers alone, but instead must be on the sales of this entire "line of commerce," that is, on the sales of the various comparable computer printer models made by Panasonic's many competitors as well.[34] Second, even assuming that lower prices by Panasonic to other distributors might well harm Oreman's own ability to compete with those distributors in the sale of all comparable computer printers, one competitor's mere inability to compete is not actionable *per se* under section 13(a).[35] Third, even assuming that Panasonic sold certain models of Panasonic printers to Oreman's direct competitors (Oreman's sole direct competitor identified in the complaint is Hall–Mark) at lower prices than it did to Oreman and did so for the sole purpose of helping these other distributors, Oreman makes no *factual* allegations that such favorable treatment by this single computer printer manufacturer to these other non-exclusive distributors had any noticeably adverse—much less substantial—effect on the competition in the sales of comparable computer printers in the United States, in Oreman's seven-state territory, or even, say, in just the Dallas area. A simple perusal of any computer magazine or large newspaper from the last few years shows the myriads not only of manufacturers and models of computer printers but also of other sellers of these innumerable printers and further suggests an extreme elasticity in market boundaries within the United States. Without further factual allegations, the Court is not free to infer the reasonable probability of a *substantial* adverse anti-competitive effect on computer printers, especially when lower prices generally promote, and not lessen, competition.[36] In other words, Oreman's complaint does not allege facts that if proven "either show substantial possibility of injury to *competition* by market analysis, *or* show injury to *a competitor accompanied by predatory intent.*"[37]

In sum, the limited factual allegations in Oreman's complaint do not suggest that Oreman's business sustained "injury of a type the antitrust laws were designed to prevent."[38]

### III. *Conclusion*

For these reasons, the Court dismisses Oreman's entire complaint at its costs.

---

purchasers at different prices"). The Court need not and does not express an opinion on this separate issue.

**34.** *Cf. Callaway Mills Co. v. FTC*, 362 F.2d 435, 441 (5th Cir.1966) (in considering antitrust effect, court must consider not only the defendant's goods but also its competitors' goods of "like grade and quality"). *Compare Domed Stadium*, 732 F.2d at 487–89 (on determining relevant product market under the Sherman Act) *with id.* at 491 (suggesting that the same standard applies for determining "any line of commerce" under the Clayton Act).

**35.** *See International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 721 (5th Cir.), *reh'g en banc denied mem.*, 521 F.2d 815 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

**36.** *Cf. Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–93, 106 S.Ct. 1348, 1357–59, 89 L.Ed.2d 538, 553–56 (1986) (courts may not lightly infer predatory pricing schemes); P. AREEDA & H. HOVENKAMP ANTITRUST LAW ¶ 720'c, at 618 (1989 Supp.) ("If the price does not violate the relevant predatory pricing standard, it cannot tend to lessen competition or to have the dangerous probability of bringing unlawful monopoly."). *Contrast Summit Health, Ltd. v. Pinhas*, — U.S. —, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991) (on allegations of a conspiracy, under section 1 of the Sherman Act, to boycott and exclude).

**37.** *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 596 (8th Cir.1987) (emphasis in original), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988).

**38.** *Feeney v. Chamberlain Manufacturing Corp.*, 831 F.2d 93, 95 (5th Cir.1987) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701, 712 (1977)).