82 N.Y.2d 158 (1993)
624 N.E.2d 129
604 N.Y.S.2d 1
Northeast General Corporation, Appellant,
v.
Wellington Advertising, Inc., et al., Respondents.
Court of Appeals of the State of New York.
Argued September 1, 1993.
Decided October 14, 1993.
Jasper & Jasper, New York City (Harvey M. Jasper and Diana T. Heitmann of counsel), for appellant.
Gibson, Dunn & Crutcher, New York City (Randy M. Mastro and Robin L. Baker of counsel), and Bobrow Greenapple Skolnik & Shakarchy (Lawrence Greenapple and Steven J. Brog of counsel), for respondents.
Chief Judge KAYE and Judges SIMONS and TITONE concur with Judge BELLACOSA; Judge HANCOCK, JR., dissents in a separate opinion in which Judge SMITH concurs; Judge LEVINE taking no part.
*160 BELLACOSA, J.
The dispositive feature of this case, in which plaintiff Northeast seeks to recover a finder's fee, is whether the finder-seller agreement between the parties created a relationship of trust between them producing a fiduciary-like obligation on the finder. The particular facet of this case devolves from a duty imposed by the lower courts on the finder to disclose adverse reputational information about the prospect tendered to its client, Wellington, the failure of which disentitles the finder of its otherwise earned fee.
This Court granted leave to appeal from the Appellate Division order, which affirmed Supreme Court's grant of defendants' CPLR 4404 (a) motion to set aside the jury verdict that would have awarded plaintiff finder its fee for services rendered. Defendants persuaded Supreme Court that Northeast violated a newly notched finder's fiduciary-like obligation when it failed to disclose the adverse reputation information about the prospect.
We reverse the Appellate Division order affirming the holding of the Supreme Court and reinstate the verdict of the jury. In these circumstances, a fiduciary relationship does not arise by operation of law, but must spring from the parties themselves, who agree to and accept the responsibilities that flow from such a contractual fiduciary bond. Courts look to the parties' agreements to discover, not generate, the nexus of relationship and the particular contractual expression establishing the parties' interdependency. Finders have a recognized role in the law and perform a fairly customary market service. Unless the particular agreement establishes a relationship of trust, one will not spring from a finder's contract in and of itself, for without some agreed-to nexus, there is no relationship of trust and, thus, no duty of highest loyalty. Rather, absent special agreement or special circumstances, the forces and mores of the marketplace govern such finder arrangements.

I.
In July of 1988, plaintiff finder Northeast General Corporation, through its agents Dunton and Margolies, entered into an agreement with defendant seller Wellington Advertising, Inc., authorized by its president Arpadi. Northeast was to act "as a non-exclusive independent investment banker and business *161 consultant for the purposes of finding and presenting candidates for purchase, sale, merger, or other business combination." The agreement further provided that the finder would be entitled to a "Completion Fee when a Transaction is closed within three (3) years after the termination of this Agreement with a party introduced and/or presented by [finder] to [Wellington]." By its terms, the understanding between these parties called for a simple service: the finder was to introduce purchaser "candidates" to Wellington for which the finder would be paid a finder's fee if a completed transaction ensued.
Margolies, after consultation with Northeast's new president Dunton, introduced Sternau to Wellington's Arpadi as a potential purchaser of Wellington. Ultimately, Sternau and Wellington entered into a purchase agreement. The record shows that before introducing Sternau to Wellington, finder's president Dunton was informed by an unidentified investment banker that Sternau had a reputation for buying companies, removing assets, rendering the companies borderline insolvent, and leaving minority investors unprotected. Dunton did not, prior to the closing of the Wellington-Sternau deal, disclose this adverse information. It is undisputed that after Northeast's introduction of Sternau to Wellington, prior to the merger agreement, Dunton called Arpadi and offered further help with the transaction. Arpadi declined that help and discouraged Dunton from any further involvement. After the merger agreement, companies controlled by Sternau purchased controlling stock of Wellington, leaving Wellington's principals, including Arpadi, as minority investors. Ultimately, Wellington was rendered insolvent and Arpadi and other minority investors suffered financial losses.
Wellington delivered a check for Northeast's finder services, but before it could be negotiated, payment was stopped. Northeast then sued to recover its finder's fee and, after trial, the jury rendered a verdict with special findings.
Defendants moved to set aside the verdict and to dismiss the action notwithstanding the verdict in favor of plaintiff. Supreme Court granted the motion essentially based on a newly notched fiduciary-like duty on finders, predicated on public policy, not expressly on the parties' agreement. No special duty to investigate was articulated as part of the new rule, only a duty to disclose known negative reputational information (151 Misc 2d 389, 393). The Appellate Division affirmed by adopting the opinion at Supreme Court (187 AD2d 302).

*162 II.
Before courts can infer and superimpose a duty of the finest loyalty, the contract and relationship of the parties must be plumbed. We recognize that "[m]any forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties" (Meinhard v Salmon, 249 N.Y. 458, 464). Chief Judge Cardozo's oft-quoted maxim is a timeless reminder that "[a] trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive" (id., at 464). If the parties find themselves or place themselves in the milieu of the "workaday" mundane marketplace, and if they do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them.
The Northeast-Wellington agreement contains no cognizable fiduciary terms or relationship. The dissent ascribes inordinate weight to the titles nonexclusive independent "investment banker and business consultant" (dissenting opn, at 171, 173). These terms in the context of this agreement are not controlling, since Dunton did not perform the services of an investment banker or consultant. Instead, Dunton's sole function was "for the purposes of finding and presenting candidates". That drives the analysis of this case because he was a traditional finder functioning under a finder's agreement, and his role ceased when he found and presented someone. The finder was not described or given the function of an agent, partner or coventurer. An elongated foot of the Chancellor extends too far with a decree declaring a fiduciary-like duty here. (See, Powell, "Cardozo's Foot": The Chancellor's Conscience and Constructive Trusts, 56 Law & Contemp Probs 7 [1993].) Such a ukase earns small jurisprudential profit in this commonplace field of commercial transaction. Probing our precedents and equitable principles unearths no supportable justification for such a judicial interposition, however highly motivated and idealistic. Indeed, responding to this fine instinct would inappropriately propel the courts into reformation of service agreements between commercially knowledgeable parties in this and perhaps countless other situations and transactions as well.
Also, a finder is not a broker, although they perform some related functions. Distinguishing between a broker and finder *163 involves an evaluation of the quality and quantity of services rendered. The finder is required to introduce and bring the parties together, without any obligation or power to negotiate the transaction, in order to earn the finder's fee (Ames v Ideal Cement Co., 37 Misc 2d 883, 886). While a broker performs that same introduction task, the broker must ordinarily also bring the parties to an agreement. A broker in New York, unlike a finder, thus carries a defined fiduciary duty to act in the best and more involved interests of the principal (TPL Assocs. v Helmsley-Spear, Inc., 146 AD2d 468; see also, John J. Reynolds, Inc. v Snow, 11 AD2d 653, affd 9 N.Y.2d 785). In this regard, defendants' effort at analogizing whatever fiduciary-like obligation brokers may have to a finder's role fails. Moreover, the finder in this case under the terms of the written agreement is definitely not a broker and did not function as a broker.
We note that a finder has far less involvement in the ultimate transaction quantitatively and qualitatively, and thus has significantly fewer and different responsibilities to the hiring client. Often, for example, the finder may accomplish work in as little as two phone calls (Minichiello v Royal Bus. Funds Corp., 18 N.Y.2d 521, 527, cert denied 389 US 820). Here, Margolies and Dunton, as Northeast's agents, did no more than introduce Sternau to Arpadi in accordance with the agreement. Indeed, the service was completed at that point under the agreement and by the ensuing conduct of the parties. Ultimately, the dispositive issue of fiduciary-like duty or no such duty is determined not by the nomenclature "finder" or "broker" or even "agent," but instead by the services agreed to under the contract between the parties. The dissent's reliance on communications between the parties before they made their agreement is misplaced (dissenting opn, at 171). None of the duties the dissent would derive from those precontract discussions was incorporated into the formal contract, which defined the relationship as one solely involving a finder. Indeed, the parties have treated their relationship solely as one involving a finder throughout. The discussions of the parties prior to the contract should not be used now to enhance the written agreement. Nor does the record support the dissent's contention that Dunton was unquestionably acting in a confidential role as investment banker and business counselor (dissenting opn, at 174). To the contrary, after the finder presented the prospect to the buyer, Arpadi explicitly rejected Dunton's offer to participate further in the *164 transaction. A finder is not transformed into a broker or fiduciary because the finder is informed of the special needs of the client so the finder can perform the finder service.
We note, too, that while agents in New York are bound to exercise the utmost good faith toward their principals (Cristallina v Christie, Manson & Woods Intl., 117 AD2d 284, 292), the plaintiff finder in this case was also not an agent in the actual or functional meaning of that term and relationship. This finder had no explicit or implied power to bind Wellington. This finder did not have the power to negotiate the transaction. This finder did not have the power to do anything except find and introduce prospects; in fact, its offer to Wellington to participate further in the transaction after presenting a prospect was rejected by Wellington. Thus, by agreement and through the actions of the parties, this finder had no power to affect any legal relations of Wellington and the prospective buyer that would propel the duties into the fiduciary-like sphere.
This Court may sense a sympathetic impulse to balance what it may view as the equities of a situation such as this. The hard judicial obligation, however, is to be intellectually disciplined against that tug. Instead, courts must focus on the precise law function reposed in them in such circumstances, which is to construe and enforce the meaning and thrust of the contract of the parties, not to purify their efforts.
In Knauss v Gottfried Krueger Brewing Co. (142 N.Y. 70), this Court analyzed a conflict of interest situation where a finder working for the seller of a brewery also took a commission from the buyer. This Court found no violation of a duty, because the character of the employment was not such as to require a duty. The path of disposition for this case is marked by parallel reasoning. The character of the Northeast-Wellington agreement was not one of trust importing duties beyond finding a prospect. The fact that Wellington did not employ its own independent, traditional methods to check out the reputation of the prospect and accepted what turned out to be a bad prospect does not warrant this Court rescuing it from its soured deal by any postagreement fiduciary lifeline.
If Wellington wanted fiduciary-like relationships or responsibilities, it could have bargained for and specified for them in the contract. We should emphasize that there is nothing inherently objectional about the "morals of the market place". Once again, Chief Judge Cardozo offers illuminating instruction:

*165 "Some relations in life impose a duty to act in accordance with the customary morality and nothing more. In those the customary morality must be the standard for the judge" (Cardozo, The Nature of the Judicial Process, reprinted in Selected Writings of Benjamin Nathan Cardozo, at 152 [Margaret E. Hall ed 1947]).
They are an acceptable fact of life in a well-ordered, free society. This Court should not attempt to elevate all the mores of society to the standard of the "punctilio of an honor the most sensitive" (Meinhard v Salmon, 249 N.Y. 458, 464, supra), where that is not justified, agreed to or expected. This Court, after all, is not the omniscient, great equalizer of the marketplace, with all its ups and downs, give and take, and varieties of conduct and relationships.
The commonplace mores of the marketplace suffice and are appropriate to govern relationships established by contract of the type involved here, which contemplates and asks nothing more of the parties than performance of a simple service. In sum, defendants' financial losses from their market mishap with Sternau is not reason enough to propel a sweeping new fiduciary-like doctrine into finders' agreements. Finally, the courts should not reform the agreed-upon finder relationship established by particular contract in this case.
We have considered the other arguments advanced by the parties and conclude that they are without merit and do not warrant further explication.
Accordingly, the order of the Appellate Division should be reversed, with costs, defendants' motion to set aside the jury verdict denied, and case remitted to Supreme Court for further appropriate proceedings (see, 151 Misc 2d 389, 390, n, supra).
HANCOCK, JR., J. (dissenting).
Does an investment banker/business consultant who is privy to critical adverse information about a prospect he is presenting to a client for a possible merger with his client's business have an obligation to disclose that information before the merger is finalized? The majority holds that, as a matter of law, there is no such duty even when, as here, the business consultant's compensation is to be based on a percentage of the dollar value of the consummated transaction and when disclosing the information would jeopardize the completion of the transaction and as a consequence, *166 the consultant's receipt of the fee. I believe that the plaintiff's conduct constituted a breach of the minimum duty of disclosure that the law requires in these circumstances and that the plaintiff, at the very least, should be precluded from claiming his fee  a percentage of a transaction whose disastrous results for his client's business he helped orchestrate. I agree with the view of Supreme Court and the unanimous Appellate Division that the law requires a higher standard of conduct in these circumstances than the majority finds acceptable. I, therefore, dissent. A discussion of this issue requires a narration of the facts and circumstances.

I
The facts are taken from the record of the trial in which the jury reached a unanimous verdict that:
"Northeast General Corporation, by its agent Kimball Dunton, [had, prior to the date of the merger of Wellington with one of Sternau's companies,] material adverse information concerning Fred Sternau, which it failed to disclose to Harry Arpadi and the Wellington Corporation".
In mid-March 1988, Harry Arpadi, president of Wellington Advertising, Inc., and a principal shareholder with 85% of its issued shares, and Kimball Dunton, chairperson of Northeast General Corporation, were introduced by a mutual friend for the purpose of discussing Arpadi's concerns about his financial future and that of his company, Wellington. Among other things, they talked about the highly liquid nature of Arpadi's company and of the possibility of another entity's acquiring an interest in it or of Arpadi's buying a second business. Between then and July 26, 1988, when the Northeast/Wellington compensation agreement was entered into, Dunton and Arpadi met a dozen times to continue their discussions about structuring a financial transaction regarding Wellington's assets in order to create a retirement plan for Arpadi. He was then 65. Arpadi disclosed confidential information to Dunton about his desires and plans and gave Dunton Wellington's audited financial statements for several periods as well as unaudited internal statements.
Wellington was a small advertising agency that had "considerable excess cash", with a liquid net worth of approximately $2 million. Arpadi wanted to take out as much cash as possible from Wellington while at the same time continuing the business so that his employees would not lose their jobs. *167 He also wanted to continue on the Wellington payroll after the contemplated transaction. Dunton knew and acknowledged Arpadi's desires. Dunton also knew that Arpadi "was enamored of making an acquisition for the upside potential, but terrified at the prospect of losing everything if the acquisition did not work out". Dunton understood "perfectly" that Arpadi was looking for a transaction with Wellington's assets  either as a buyer or a seller  that would be lucrative yet relatively nonrisky to maximize his retirement reserve.
At a meeting at Northeast on July 26, 1988, among Arpadi, Dunton and Mel Margolies, then president of Northeast, Margolies suggested that Arpadi sign an agreement that defined Northeast's compensation for its services in bringing about the desired transaction. The compensation agreement was immediately prepared in Northeast's offices under the supervision of Margolies, an attorney. At this same meeting, Arpadi signed his acceptance to the agreement without having an attorney review it. Northeast was to be compensated as a nonexclusive, independent investment banker and business consultant for finding and presenting prospects for a purchase, sale, merger or other transaction relating to Wellington. The compensation was fixed as a percentage of the dollar amount of the transaction.
Three days after the compensation agreement was signed, Margolies left the employ of Northeast and immediately began working for Charles Street Securities, whose clients included Fred Sternau, owner of RFLR Sub, the company which eventually bought out Wellington's shareholders in a merger. At a meeting on August 8, 1988, at which Arpadi, Margolies and Dunton were present, the three determined that Arpadi should be a seller, not a buyer. Also, at this meeting, the three men agreed that Margolies, now no longer in the employ of Northeast, could introduce clients of his current company, Charles Street, to Arpadi as prospective buyers[1] and that Dunton would still receive his fee based on a percentage of the deal.[2]
About three weeks after Margolies left Northeast, he telephoned Arpadi telling him that some of Charles Street's *168 clients had expressed an interest in acquiring Wellington.[3] Within weeks, Margolies introduced Sternau, and a few other candidates, to Arpadi. By mid-September, Dunton had learned from Margolis that Fred Sternau was involved in the transaction.
It is undisputed that Dunton possessed critical information about Sternau throughout the contract period. Several years before, he had had prior contact with Sternau when he was considering buying a Sternau-owned printing company. After reviewing its financial statements submitted by Sternau, Dunton determined that the printing company bordered on insolvency. Dunton's own "investment banker who introduced [Dunton] to [Sternau] had told [Dunton] of other transactions that [it] had investigated, and they all followed the same general pattern": Sternau would buy a company, siphon off the cash, leave it insolvent, with the minority shareholders "holding the bag". Thus, aided by the disclosure from his own investment banker who had acted as finder to introduce Sternau to him, Dunton concluded that Sternau's integrity as a business prospect was questionable, and decided not to buy Sternau's company. Dunton did not disclose this information to Arpadi.
In September 1988, Dunton called Arpadi to discuss the prospects of a deal with Fred Sternau and to offer help in the upcoming discussions with Sternau. Arpadi told Dunton that he was "comfortable" with the advisors he was using  Arpadi now relied heavily on Margolies  and he did not need Dunton's services at that time, but would call on him if needed. In late November or early December knowing that preparations for the merger were in high gear, Dunton wrote Arpadi, requesting arrangements for the payment of his fee at closing; a few days later, over the telephone, Arpadi and Dunton made such arrangements. During the period from the signing of the compensation agreement until the closing of the merger between Wellington and Sternau's company, RFLR Sub, Dunton knew the following three pieces of information about Wellington and Arpadi. First, Dunton knew that Arpadi intended to use the proceeds of the transaction to fund his retirement plan, that this transaction represented to Arpadi the culmination of his years at Wellington. Second, Dunton knew from Wellington's financial statements that Wellington was a *169 highly liquid, profitable corporation, which made it a prized target to any investor who wanted to acquire such a company in order to extract the cash for use in other transactions. Third and most important, Dunton knew the structure of the Wellington deal: that Arpadi planned to continue on the payroll at Wellington after the merger; indeed, the merger agreement included a covenant that Arpadi and Wellington were to enter into an employment agreement, under which Arpadi could continue on the payroll of the merged company for five years.
Even though his own investment banker had in the past disclosed adverse information to him about Sternau, at no time from Dunton's first awareness that Sternau was involved in the Wellington deal until the closing did Dunton reveal to Arpadi the adverse business facts he possessed about Sternau. Arpadi testified that, during the December telephone call with Dunton, he asked Dunton "do you know Mr. Sternau, do you have any knowledge about him" and that Dunton said "I vaguely know of him".[4]
On January 9, 1989, Sternau's company, RFLR Sub, merged into Wellington, with Wellington as the surviving corporation. The merger was accomplished by RFLR, the parent of RFLR Sub, purchasing from Arpadi, his wife, and another stockholder their Wellington common stock, 1,416,437 shares, which constituted 85% of the company's shares, at $1 per share. Arpadi received approximately $1.2 million for his shares. The purchase thus left Arpadi and his wife as minority stockholders. Also as part of the merger, RFLR Sub was to issue to these stockholders RFLR Sub preferred stock, par value $100 per share, in the amount of 10% of Wellington's total equity, that is, for $239,817. Further, it was agreed that Arpadi could remain employed at Wellington for five years at a salary of $175,000 per year, with a bonus of $300,000 after two years; he was to receive $25,000 per year for five years for not competing with Wellington.
The deal soured shortly thereafter. Arpadi never received the RFLR Sub preferred stock. A year and a half later during *170 the summer of 1990, Arpadi learned that the company was having "some problems", that there was "not enough money to pay bills and salaries". By September 1990, Arpadi was no longer getting his promised salary; he had received only one year's noncompeting payment and never received his bonus. All in all, Arpadi was out approximately $950,000 in expected payments. In the Wellington merger, Sternau had held true to his previous pattern. He had emptied Wellington of its cash, in part, for investment in transactions with Merrill Lynch, leaving Arpadi and the other minority stockholders "holding the bag". For introducing Arpadi to Margolies, Sternau's agent, Dunton claims that Arpadi now owes him $150,000.
The Supreme Court concluded it "would be unconscionable and contrary to public policy" if Dunton could collect a fee for soliciting "prospective buyers among known confidence men, swindlers and the like." (Northeast Gen. Corp. v Wellington Adv., 151 Misc 2d 389, 393, 394, supra.) The court reasoned that "[p]ublic policy requires at the very least that a finder reveal to his client such material adverse information as he has before he can claim any fee for bringing the parties together" (id., at 394). The Appellate Division affirmed for the reasons stated by Supreme Court.

II
The sole question is whether, in view of the relationship between Arpadi and Dunton in which Arpadi revealed confidential business information and his personal desires, wishes, and intentions for Wellington's future, Dunton had any legal obligation to divulge crucial negative information he possessed about Sternau. In an answer to a submitted interrogatory, the jury found that this adverse information was material. Indeed, there can be no doubt that Dunton  given his awareness of Sternau's proclivity as a raider and of confidential information relating to Arpadi's business plans  must have known that the proposed merger was of the very kind that Arpadi had said he was "terrified" he "would lose everything [in]". Dunton certainly had good reason to fear that disclosure of the negative information would terminate the deal and, with it, his prospects for receiving a percentage fee. Yet, the majority holds that Dunton need not have said anything contrary about Sternau; he could simply sit back, let the deal play out towards its disastrous end, and collect his commission.
The majority's conclusion that Dunton could reap the benefits *171 of his own calculated silence rests on two premises: (1) that the relationship between Dunton and Arpadi during the period when Dunton withheld material information can be equated with the sort of "arm's length" transaction referred to in Meinhard v Salmon (249 N.Y. 458, 464), and (2) that no legal duty can be imposed on Dunton to disclose material adverse knowledge because no fiduciary relationship is specifically spelled out in the agreement. Neither premise has support in the record or in established legal principles.
First, the majority describes the relationship between Dunton and Arpadi as within the "commonplace field of commercial transaction" (majority opn, at 162) because Dunton was to perform merely the services of a "finder" (id., at 162-163). The majority characterizes an agreement for finding services as the sort of arm's length transaction which deserves no more protection than that afforded by the "morals of the market place" (Meinhard, supra, at 464; see, majority opn, at 162). By thus labelling the services to be performed under the agreement, the majority concludes that there can be no relation of trust or confidentiality. Consequently, in this "buyer beware" context, Dunton's conduct was perfectly permissible.
The record  the contract as well as the "special circumstances" of Dunton's and Arpadi's conduct (majority opn, at 160)  establishes conclusively that the relationship was not at all as the majority would have it. Far from calling only for services as a finder, the compensation agreement specifies that Northeast was retained as an "investment banker and business consultant for the purposes of finding and presenting candidates for" (emphasis added) a business transaction involving Wellington. Not only did the contract provide that Northeast was to act as an investment banker and business consultant in finding and introducing a prospect, but the record shows that Northeast, acting through its agent Dunton, performed in precisely these capacities. Dunton and Arpadi held a dozen meetings before the contract was signed, in which Dunton obtained confidential information about Wellington's financial makeup and Arpadi's private business plans. The record thus indicates that Dunton was not engaged in an arm's length transaction with Arpadi, but as his business advisor and counselor to introduce Arpadi to candidates likely to undertake the kind of transaction that he was seeking.
For its second premise supporting the conclusion that there could be no fiduciary relationship between Dunton, acting for *172 Northeast, and Arpadi, the majority focuses on the compensation agreement. It reasons that "a fiduciary relationship * * * must spring from the parties themselves, who agree to and accept the responsibilities" of such a relation in the contract and that "absent special agreement or special circumstances" a finder compact does not establish a relationship of trust (majority opn, at 160). Because no fiduciary relationship is spelled out in the agreement and because Dunton was assertedly only to be a finder (an assertion that the wording of the agreement itself refutes), the argument is that there can be no fiduciary relationship and, thus, no duty to disclose critical adverse information. But the cases do not so narrowly restrict the categories of relationship from which fiduciary duties may arise. It is fundamental that a fiduciary duty "is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation." (Restatement [Second] of Torts § 874, comment b; see, e.g., Fisher v Bishop, 108 N.Y. 25; United States v Reed, 601 F Supp 685, 708 [SD NY], revd in part on other grounds 773 F.2d 477 [2d Cir 1985]; Mandelblatt v Devon Stores, 132 AD2d 162.) The established rule is:
"A fiduciary relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another. The term is a very broad one. It is said that the relation exists, and that relief is granted in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. Out of such a relation, the law raises the rules that neither party may exert influence or pressure upon the other" (Mobil Oil Corp. v Rubenfeld, 72 Misc 2d 392, 399-400, affd 77 Misc 2d 962, revd on other grounds 48 AD2d 428, affd 40 N.Y.2d 936 [emphasis added]; see also, Quintel Corp. v Citibank, 567 F Supp 1357 [SD NY 1983]; Penato v George, 52 AD2d 939, appeals dismissed 42 N.Y.2d 908).
A "fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the *173 benefit of another upon matters within the scope of the relation" (Restatement [Second] of Torts § 874, comment a; see also, Mandelblatt, supra, at 168). The essential elements of a fiduciary relation are "the concepts of reliance, and de facto control and dominance" (Reed, supra, at 708 [quoting United States v Margiotta, 688 F.2d 108, 125 (2d Cir 1982), cert denied 461 US 913 (1983)]); that is, "[a] fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other" (id., at 707).
The narrow question applying the above rules is whether Arpadi's and Dunton's relationship exhibits sufficient trust and de facto control upon which to ground Dunton's duty to disclose negative information regarding the very deal he was promoting. The record reveals more than enough evidence to demonstrate both elements. By imparting confidential business details as well as his personal plans and intentions, Arpadi reposed trust in Dunton as a business counselor to find candidates likely to conform to Arpadi's investment goals. Arpadi expected Dunton to perform as a finder with Arpadi's interests at heart, i.e., not to remain silent as Wellington was being circled by a corporate predator. Dunton exerted de facto control and influence over Arpadi by deliberately remaining silent about Sternau's business history, thereby fostering Arpadi's false belief that there was no reason not to accept Sternau as a suitable candidate. Dunton's review of the intimate details of Arpadi's business marked Dunton's acceptance of that trust. There is no doubt that as regards the proposed merger with RFLR Sub, Dunton and Arpadi stood in a fiduciary relation to each other.
The majority's view of this case is epitomized in the statement "[a] finder is not transformed into a broker or fiduciary because the finder is informed of the special needs of the client" (majority opn, at 164). By holding fast to a formalistic, a priori assumption that performance as a finder categorically negates any confidential relationship, the majority simply concludes that Dunton, performing as a finder here, could not possibly have acted as a fiduciary to Arpadi. The majority misses the point, though, that even if the services that Dunton performed under the contract are labelled as only those of a finder, Dunton would nonetheless be in a fiduciary relationship with Arpadi and still owe him a duty to disclose negative facts about Sternau. It is in the entire complex of the Arpadi-Dunton association, not just in the agreement, that the fiduciary relation is found. Thus, performance of the act of finding *174 cannot be isolated from the realities of the transaction in which the finding is to take place (see, Restatement [Second] of Torts § 874; Fisher, supra, at 29; Reed, supra, at 708; Mandelblatt, supra, at 168).
The record shows that both before and after the compensation agreement was signed, Dunton obtained confidential information pertaining to Arpadi's own business needs as well as the financial records of Wellington.[5] Dunton needed this information to accomplish the complex tasks of structuring possible mergers or other deals and finding candidates for those deals that would accommodate Arpadi's retirement plans and his goals for Wellington and its employees; in doing so, Dunton was unquestionably acting in a confidential role as investment banker and business counselor. Contrary to the majority view (see, majority opn, at 163), it is unreasonable to conclude that once Dunton's services progressed to the stage of actually finding a deal  which, significantly, contemplated Arpadi's continued stake as a minority shareholder and further involvement in its affairs  Dunton's relationship with Arpadi would lose all aspects of trust and confidentiality and he could, without restriction, propose a candidate inimical to Arpadi's interests. Realistically, it is impossible to separate Dunton's responsibility for tailoring a program of transactions *175 likely to meet Arpadi's "wish list" (see, supra, n 5) from his finding a candidate suitable to fit in with that program.
There is a final point. Even if only the agreement between Northeast and Arpadi were to be considered, the law would, I submit, imply a duty on the part of Dunton to disclose critical adverse information in these circumstances. As we said in Wieder v Skala (80 N.Y.2d 628) in finding an implied promise by the employer law firm not to fire an associate for adhering to ethical standards of professional conduct:
"`What courts are doing [when an omitted term is implied]', Professor Corbin explains, `whether calling the process "implication" of promises, or interpreting the requirements of "good faith", as the current fashion may be, is but a recognition that the parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations' (3 Corbin, Contracts § 570, 1992 Supp, at 411)" (id., at 637).
One can hardly think that it must be spelled out in the retainer of a business consultant that the consultant will not propose a prospect that he or she knows could be dangerous to the client's interest without at least disclosing that information. Such a covenant is so fundamental to the performance of the contract as not to require expression. Yet the majority holds that the law does not impose on Dunton this minimal duty of disclosure. It is not necessary to bind Dunton to the "punctilio of an honor the most sensitive" (Meinhard, supra, at 464) to hold that in these circumstances that he should not have withheld damaging information about Sternau, thereby assuring the consummation of the deal and in turn the collection of his fee. I think that fundamental legal principles imposed on him, at the very least in these circumstances, the duty to disclose. Indeed, I believe that many would agree that even the "morals of the market place" (id., at 464) would require it. Surely, he should not be rewarded for his failure.
Order reversed, with costs, defendants' motion to set aside the jury verdict denied, and case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein.
NOTES
[1] At this time Margolies did not inform Dunton or Arpadi that Sternau might be a potential prospect.
[2] Ultimately, Dunton earned his finder's commission for "introducing" Arpadi not to Fred Sternau, who controlled the corporation that bought out Wellington, but to Sternau's agent, Margolies, who only three weeks before had prepared the agreement by which Dunton was to be compensated.
[3] By this time Margolies still had not informed Arpadi or Dunton that Sternau was a potential prospect.
[4] Supreme Court expressly rejected plaintiff's contention that Arpadi prevented Dunton from revealing adverse information about Sternau, stating: "By no rational interpretation of any of the evidence can such a conclusion be reached. There was nothing to prevent Dunton * * * from picking up the telephone and conveying to Arpadi * * * that he had adverse information concerning Sternau" (Northeast Gen. Corp. v Wellington Adv., 151 Misc 2d 389, 394).
[5] Dunton testified that at his first meeting in mid-March with Arpadi: "We discussed his clientele, which was unique; his financial status of his company, which was highly liquid; his approach in retirement, which had not been fully anticipated or planned from a financial standpoint. We also discussed preliminarily the advantages of using the excess cash that existed in his company * * * for acquisition purposes to enhance the value of the company as opposed to dividending the stock out and incurring a current tax on the dividend. We also discussed the possibility that * * * some other corporate entity * * * might have an interest in acquiring his family's ownership in Wellington". Dunton testified that up to July of 1988, he and Arpadi had had "[p]robably a dozen, maybe more" meetings.

Dunton reported that Arpadi had given Dunton a "wish list" of his goals for any transaction with Wellington's assets: to "take out of the company as much of his cash he had accumulated as possible"; to "continue the business so that his employees could have continued employment"; to "continue to serve and enjoy revenues from his then employment".
Dunton testified that he had requested June 30, 1988 internal financial statements for Wellington and that these were not ready until August. Dunton had requested them "[b]ecause they were necessary to * * * transmit to any prospective purchaser in the event that serious interest in the company developed on the part of a purchaser". Also, after the compensation agreement had been signed, Arpadi had sent to Dunton draft financial statements for forwarding to Charles Street Securities.